UNITED STATES of America and William L. Bierman, Special Agent Internal Revenue Service, Petitioners,

v.

Paul FRIEDMAN, Respondent,

and

Morris Kirshenbaum and Joy Kirshenbaum, Intervenors.

UNITED STATES of America and William L. Bierman, Special Agent Internal Revenue Service, Petitioners,

v.

PITTSBURGH NATIONAL BANK et al., Respondents,

and

Morris Kirshenbaum and Joy Kirshenbaum, Intervenors.

UNITED STATES of America and William L. Bierman, Special Agent Internal Revenue Service, Petitioners,

v.

IVY SCHOOL OF PROFESSIONAL ART, INC. and Morris B. Kirshenbaum, as president of Ivy School of Professional Art, Inc., Respondents.

Civ. A. Nos. 74–195, 74–346, 74–557.

United States District Court,
W. D. Pennsylvania.

Feb. 3, 1975.

Thomas A. Daley, Asst. U. S. Atty., Pittsburgh, Pa., Stephen G. Fuertl Tax Div. Dept. of Justice, Wash. D. C., for petitioners.

Stanley W. Greenfield, Pittsburgh, Pa., for Paul Friedman.

James B. Brown, Rothman, Gordon, Foreman & Groudine, Pittsburgh, Pa.,

for Morris and Joy Kirshenbaum, and Ivy School of Professional Art, Inc.·

B. A. Karlowitz, Pittsburgh, Pa., for Pittsburgh Nat. Bank.

Kenneth P. Simon, Pittsburgh, Pa., for Mellon Bank.

Robert H. Stevenson, Pittsburgh, Pa., for Equibank.

TEITELBAUM, District Judge.

## OPINION

On December 11, 1973, three Internal Revenue Service (IRS) summonses [Treasury Form 2039] were issued by Special Agent William L. Bierman of the IRS and served upon defendants Pittsburgh National Bank (PNB), Mellon Bank, N. A. (Mellon) and EQUIBANK, under purported authority of 26 U.S.C. § 7602. The summonses requested all records pertaining to Morris and Joy Kirshenbaum and the Ivy School of Professional Art, Inc. for the years 1969 to 1972. The Banks duly notified their taxpayer customers of the IRS summonses. The taxpayers brought suit to enjoin the IRS from seeking compliance with the summonses, but were initially denied standing at Civil Action No. 73–1093 in an Opinion and Order of this Court dated February 4, 1974. The banks, however, refused to comply with the summonses and the IRS brought this action to enforce the summonses. At this point, the taxpayers were permitted to intervene for reasons which will be more fully explained later in this Opinion.

Several hearings have been held, briefs submitted and with the stipulated consent of all parties, the IRS has substituted six (6) new summonses to replace the original three (3). The substituted summonses basically request the same information as before, but offer the assistance of Government personnel in searching and copying bank records and indicate that all of the information requested does not have to be produced at the same time. The banks still have refused compliance and the cases are before the Court for what will hopefully be a definitive effort as to the rights and responsibilities of the parties with respect to § 7602 IRS summonses.

## INTERVENTION

At the outset it is necessary to direct attention to the immediate problem presented: whether or not taxpayers have a right to intervene and defend where a § 7602 summons is served upon a third party such as a bank. In the Opinion of February 4, 1974 in this case, I permitted such intervention because of the clear and unique testimony of Special Agent Bierman. As will become clear, the agent's testimony made apparent that this was a fact situation which did not fall within the ambit of those situations covered by existing case law on § 7602. See Reisman v. Caplin, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964); United States v. Continental Bank & Trust Co., 503 F.2d 45 (10th Cir. 1974); United States v. Dauphin Deposit Trust Co., 385 F.2d 129 (3rd Cir. 1967). At the initial hearing on this matter, held on December 27, 1973, I inquired of Agent Bierman as follows:

> THE COURT: You are investigating it together for the purpose of determining whether or not a recommendation should be made as to criminal prosecution?
>
> AGENT BIERMAN: That's right, your Honor. (Transcript at page 18)

Counsel for Mr. Kirshenbaum then asked Agent Bierman:

> QUESTION: Is that the prime function of this, to make sure whether or not to determine whether or not a recommendation for criminal prosecution should be made?
>
> AGENT BIERMAN: The prime function of the investigation is to determine if a criminal violation has occurred, that is correct. (Transcript at page 18)

Later, counsel for Mr. Kirshenbaum asked:

> QUESTION: Is it fair to say that the *sole purpose* of this investigation

is to gather information to determine whether or not there is any criminal violation of the tax laws? (emphasis added)

ANSWER: Yes, I would say that is a fair statement.

QUESTION: And is a special agent usually attached to a civil tax audit?

ANSWER: No. (Transcript at page 20)

The Government's contention in this case is that it was Special Agent Bierman's testimony that in his capacity as a special agent, he is conducting a *joint* investigation along with a revenue agent, one William Jackson, seeking information concerning the possibility of civil or criminal violation of the tax laws. But it is interesting to note that at the December 27th hearing, Agent Bierman made no mention of a "joint" investigation wherein revenue agent William Jackson was involved. As appears above, his reference was to an investigation by himself whose "prime function" or "sole purpose" was to determine if a criminal violation of the Internal Revenue Laws has taken place. At the hearing, Agent Bierman specifically testified that Revenue Agent Jackson had never accompanied him on any interviews nor had been with him when he (Bierman) had served § 7602 summonses in this case.

■ It is true that later in the hearing Special Agent Bierman attempted to change his tesimony, apparently after conferring with colleagues and superiors, but the fact remains that he had stated on the record that his was a criminal investigation. It is this salient feature that distinguishes this case from others in the area and this feature which led me to allow the taxpayer to intervene. I felt that because the taxpayer faced the prospect of durance vile, it was only fair that he be a party to proceedings against him, aware of the possibility of any charges to be brought against him; in short, a participant in the process of which he played an integral, though heretofore silent role.

The catastrophic effect upon taxpayers, particularly business people, when it becomes known that the criminal division of the Internal Revenue Service is investigating their affairs hardly needs explanation. Although the records sought do not technically belong to the taxpayers in an instance where a § 7602 summons is served upon a third-party bank, such records are itemized under the taxpayer's name and the clear intent of the Government is to utilize such records in a manner adverse to the interests of said taxpayers. I believe that the equities of this situation require that the taxpayers be allowed to intervene as they have been permitted in this case.

At the December 27 hearing a question of fact as to the issue of whether or not this was a criminal investigation was raised as a result of Agent Bierman's testimony. Therefore, intervention was permitted in order to allow the taxpayers to demonstrate that this is purely a criminal investigation and thus, that the use of a § 7602 civil summons is improper. The taxpayers and respondent banks have failed to sustain that burden.

This investigation has been shown to fall within the usual investigatory pattern which pertains whenever the IRS is presented with information that a violation of the income tax laws may have occurred. Except in the case of what would clearly appear to be a civil matter (an incorrectly stated deduction, for instance), any other situation which presents a potential criminal violation, such as a failure to report a substantial amount of income, will normally be investigated by pursuing the possibility of criminal charges first, with investigation of the civil implications of the case being held in abeyance.

The IRS can hardly be criticized for pursuing the criminal possibilities first. The threat, real or implied, of criminal charges is, legitimately enough in our system of government, the most effective weapon and strongest negative inducement the IRS possesses to insure

compliance with the nation's internal revenue laws. The point is best demonstrated by looking at the situation from the other point of view: it would clearly be improper for the IRS to proceed in all its investigations as if the only coercion it were able to bring to bear were civil penalties, only to spring the likelihood of criminal violations on unwitting taxpayers and their counsel at the last minute.

■ In this case and in the usual course of events then, the special agent will pursue the likelihood of criminal violations almost independently, but with the equally plausible likelihood of possible civil liability ever-present in the background, using the § 7602 summons all the while to garner the information needed in order to make a decision. If criminal charges are not forthcoming for any reason, the civil liability option is always waiting to be activated.

The problems in a § 7602 enforcement proceeding then are primarily situational, attitudinal and semantic. As explained above, the usual IRS investigation situation embodies a subtle paradox: the coexistence of two equally plausible enforcement options, epitomized in a statute which might easily lead the casual observer to leap to the conclusion that only one of those options, that of civil enforcement, is open to the Government. Because the statute is at best poorly worded and impractical, it leads to two very unfortunate behavior patterns on the part of government officials who come before federal courts to have such summonses enforced. The first is an understandable inability on the part of IRS agents to explain what they are doing, an inability to articulate which, depending on one's point of view, may be seen as either pathetic or hypocritical. The second syndrome is far more irksome and occurs when, under the stress of questioning by the court or cross-examination by counsel, the government's inability to explain the § 7602 paradox turns into defensiveness and sometimes outright hostility on their part. No court can or should countenance an attitude on the part of government counsel which transmits the highly inappropriate message that a § 7602 enforcement proceeding is a test of strength in which the government need tell the Court none of its "secrets" and may nevertheless expect a sort of *carte blanche*, rubber stamp approval by the court.

26 U.S.C. § 7602

The statute in question authorizes the issuance of such summonses for the examination of records for "noncriminal purposes":

> For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary or of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate [is authorized to issue such a summons].

As is apparent, there is no mention in the statute of criminal tax penalties or prosecution as a permissible purpose for the issuance of § 7602 summons.

It has long been recognized that if the Courts are to serve their function of protecting our Constitutional liberties from erosion, vigilant watchfulness must be maintained in order to insure that the summonses are issued for the purposes Congress intended and none other. As stated in United States v. O'Connor, 118 F.Supp. 248 (D.Mass.1953):

> To encourage the use of administrative subpoenaes as a device for compulsory disclosure of testimony to be used in presentment of criminal cases would diminish one of the fundamental guarantees of liberty. Moreover, it would sanction perversion of statutory power. The power under § 3614 [the 1939 Internal Revenue Code predecessor to what is now § 7602] was granted for one purpose, and is now sought to be used in a direction entirely uncontemplated by the lawgivers.

And, as was stated in Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L. Ed.2d 668 (1960):

> The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts. The preliminary stages of a criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of the Constitution and laws of the United States.

Thus, with the case of Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), the Supreme Court set up the double-pronged standard by which the validity of an Internal Revenue summons may be tested:

> We hold that under § 7602 an internal revenue summons may be issued in aid of an investigation [1] if it is issued in good faith and [2] prior to a recommendation for criminal prosecution. *Id.* at 536, 91 S.Ct. at 545.

It is uncontradicted in this case that the summonses in question here were issued by the Government prior to a recommendation for criminal prosecution. However, the first requirement of the two-prong test remains under attack, that is, the question of whether the issuance of the summonses was undertaken in good faith. The ambit of this good-faith standard has been further delineated by the Supreme Court in United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), wherein it is stated that in order to be entitled to enforcement of the § 7602 summonses, the Government must show:

> That the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed . . . . This does not make meaningless the adversary hearing to which the taxpayer is entitled before enforcement is

ordered. At the hearing he "may challenge the summons on any appropriate ground," Reisman v. Caplin, 375 U.S. 440–449, [84 S.Ct. 508, 11 L. Ed.2d 459]. Nor does our reading of the statute mean that under no circumstances may the Court inquire into the underlying reasons for the examination. It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. The burden of showing an abuse of the court's process is on the taxpayer . . . ." 379 U.S. at 57–58, 85 S.Ct. at 255.

It is clear from the record and uncontested by the parties that all necessary administrative steps have been followed in this instance and that the information sought is not already in the possession of the Government. Thus, the issues remaining before this Court as to these summonses are: 1. whether the investigation is being conducted pursuant to legitimate purposes; 2. whether the information sought is relevant to the investigation; and 3. whether the demand of the summons is too broad or burdensome so as to be violative of the Fourth or Fifth Amendment rights of the respondent banks or the intervenors.

The present practice of the IRS seems to be that various members of the Intelligence Division are permitted to fill out and serve summons calling for various documents and files concerning certain taxpayers and serve them on third parties, in this case, banks, with very little supervision and with a great deal of discretion being placed in the hands of field agents. Indeed, it sometimes seems that a very broad use of summons is automatic. This situation might not be so offensive in itself were it not for the fact that the Intelligence Division

and the Internal Revenue Service take the attitude that review of these matters is not within the discretion of the Court and that they have an absolute right to have such summonses enforced. I do not believe this.

◼ While most members of the Intelligence Division are doubtless very discreet about such matters, there are also a certain number of "eager beavers" in any organization and I believe that the power to issue such a summons must be closely delimited. I do not believe that the Court should act as a rubber stamp in this matter, especially since the right of privacy of individuals is involved. Only select documents should be obtainable for the limited purpose of actually determining tax liability. Thus, where compliance with a summons is contested, I believe that the Court should examine the matter to determine whether there is a reasonable basis for seeking the requested documents and to make sure that it is not merely a "fishing expedition." A Federal District Court Judge has more options than Tennyson's Light Brigade whose choice was "not to reason why, their's but to do and die."

The matter is further complicated by the fact that the Internal Revenue Service frequently contends, as it has done here, that the nature of the investigation is secret or confidential and cannot be revealed, even to the Courts. I have become amazed at the frequency with which such claims of privilege have been raised and how sacrosanct they have apparently become in the eyes of government officials.

The short answer to this seems to me to be that the Government should either justify to the Court the need for the documents or abandon their claim. There doubtless are secrets in Government, such as diplomatic codes or war plans, but in most instances claims of secrecy are pure "hog wash." In essence then, I would permit the taxpayer to intervene and would examine the summonses to determine whether there is a reasonable basis to examine the doc-uments requested for the only purpose for which the summons can be used, i. e. to determine tax liability.

◼ I think we must also closely examine the due process factor of requiring banks or other institutions to go to the considerable expense of assembling such documents. It seems to me that what is not fair is not due process and that the Government should pay the cost of such search as a condition precedent to obtaining any documents. See United States v. Dauphin Deposit Trust Co., *supra*, 385 F.2d at 129, n. 1 and United States v. First National Bank of Fort Smith, Ark., 173 F.Supp. 716 (W.D. Ark.1959). I do not mean to imply a probable cause test to the right to examine documents, but I do feel that mere whim of the special agent is not enough. See United States v. Powell, 379 U.S. 48, 57–58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), wherein a probable cause test in such an instance is specifically rejected.

◼ One further aspect of this situation requires discussion. The original and substituted summonses seek records of entry to the safe deposit boxes (if any) by the taxpayers. Since the examination of these records can lead only to possible evidence of criminal liability, and since, for these purposes, I accept the proposition that this is indeed a "joint" investigation entailing both criminal and civil liability potentially, I will order the demand for records of entry to safe deposit boxes stricken from the substituted summonses. The IRS has no business using a civil summons to obtain information which can lead *only* to criminal evidence.

In this case the summonses in question were served upon Mellon Bank, which has 102 branch banking offices, PNB which has 94 branch banking offices and Equibank which has some 80 branch banking offices. To have complied with the original summonses in this case would have required a search of some 276 banking locations.

◼ It is my belief that before these banks, or indeed any others, are re-

quired to spend thousands of dollars in employees' time in response to a § 7602 summons, the IRS should have some basis to believe that: 1. the records do exist and are in the possession of the bank; 2. the records sought do have some bearing on the customer's income tax liability; 3. the IRS has exhausted all other and less costly alternatives to obtain the same documents.

■ Perhaps in setting out these standards I am setting up an ideal situation—for my experience both at the bench and bar convinces me that such a state of affairs can only exist if such standards are imposed by a court of law which has brought to the attention of all concerned the full panoply of both negative and positive inducements which it has at its disposal. Toward that end, in this instance, I feel that the best means to insure compliance with each of the three elements set forth above is to obligate the IRS to pay the bank the actual costs of searching their records. The alternative proposed by the Government in their substituted summonses, that is, a search of banking records by IRS personnel other than bank personnel, is unacceptable. The unavoidable fact is that in conducting such a search, no well-trained IRS agent would be able to ignore or forget the information he found of other criminal violations, real or potential, pertaining to other people. The only means available for maintaining both a minimum of cost and the confidentiality which such records deserve in the normal instance is to obligate the IRS to pay to the bank the actual cost of searching for such records that they wish to have.

My reasoning is obvious. Faced with the obligation to pay the cost of such a search, the IRS will impose upon itself those limitations which will insure that the records sought do exist and are in possession of the third parties upon whom the summonses are issued, that the records do have a bearing on the taxpayer's income tax liability, and that the IRS has exhausted all other and less costly alternatives to obtain the same documents.

■ If the IRS follows these self-imposed limitations we can be assured that in the future that the summonses will not be overly broad and will be confined to only relevant material. It seems to me that this statute invites hypocrisy and dissimulation on the part of Government [1] investigators who are required to walk a verbal tightrope before a court which considers the propriety of such a summons and say that they are seeking both criminal and civil penalties at the same time when as a matter of fact they are taking full advantage of a lenient civil procedure for the obtaining of records when a criminal subpoena might be more appropriate. It seems to me that if, in accordance with the standards that have been set out in this case, the IRS is required to proceed fully and in every detail in good faith, that is, to refrain from using these summonses as fishing nets, the negative effects of this statute will be accordingly limited. Only a court, in considering the petition to enforce such a summons will be able to determine whether or not the IRS is proceeding in good faith in any particular instance. As noted before, the standard upon which it must base its judgment is not one of probable cause, but rather one of relevancy and good faith and, more particularly, in accordance with those standards delineated above. Hopefully, if in the future § 7602 summonses are judged according to the standards used in this instance, all parties will be able to proceed harmoniously with the legitimate purposes of each group held in balance.

■ Therefore, because I have found, in accordance with the case law, that the information sought is relevant to the investigation and, with the strictures and limitations imposed upon the Govern-

---

[1]. Reference might be made to S. 2200, a bill currently before Congress which corrects certain of the inequities inherent in this situation.

ment in this Opinion, that the investigation is being conducted pursuant to legitimate purposes and that its demands are not violative of the constitutional rights of the respondents or intervenors, I will order the summonses to be enforced.

An appropriate order in accordance with the above Opinion will be entered. The foregoing shall constitute findings of fact and conclusions of law in accordance with F.R.Civ.P. 52(a).