928

UNITED STATES of America and
William L. Beerman, Special Agent,
Internal Revenue Service

v.

Paul FRIEDMAN et al.,

Appeal of Morris KIRSHENBAUM and
Joy Kirshenbaum, Intervenors in
District Court.

UNITED STATES of America and
William L. Beerman, Special Agent,
Internal Revenue Service

v.

PITTSBURGH NATIONAL BANK et al.,
and Morris Kirshenbaum and Joy Kir-
shenbaum, Intervenors in D. C.

UNITED STATES of America and
William L. Beerman, Special Agent,
Internal Revenue Service

v.

IVY SCHOOL OF PROFESSIONAL ART,
INC. and Morris B. Kirshenbaum, as
President of Ivy School of Professional
Art, Inc.

Appeal of Morris KIRSHENBAUM and
Joy Kirshenbaum, Intervenors in D. C.,
and Ivy School of Professional Art, Inc.,
and Morris B. Kirshenbaum, as President
of Ivy School of Professional Art, Inc.

UNITED STATES of America and Wil-
liam L. Beerman, Special Agent, Inter-
nal Revenue Service, Appellants,

v.

PITTSBURGH NATIONAL BANK et al.,
Morris Kirshenbaum and Joy Kirshen-
baum, Intervenors in D. C.

Nos. 75–1276, 75–1277 and 75–1480.

United States Court of Appeals,
Third Circuit.

Argued Jan. 13, 1976.

Decided March 22, 1976.

Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Robert E. Lindsay, Jeffrey S. Blum, Attys., Tax Div., Dept. of Justice, Washington, D. C., for U. S. and William L. Beerman, Special Agent, I. R. S.; Blair A. Griffith, U. S. Atty., of counsel.

Robert A. Cohen, Emil W. Herman, Rothman, Gordon, Foreman & Groudine, Pittsburgh, Pa., for appellants-intervenors Morris Kirshenbaum and Joy Kirshenbaum.

B. A. Karlowitz, Donald L. Very, Tucker Arensberg & Ferguson, Pittsburgh, Pa., for Pittsburgh Nat. Bank.

Kenneth P. Simon, Reed Smith Shaw & McClay, Pittsburgh, Pa., for Mellon Bank, N. A.

Robert H. Stevenson, Anderson, Moreland & Bush, Pittsburgh, Pa., for Equibank N. A.

John Fletcher Rolph, III, Tax Counsel, Henry C. Ruempler, III, Asst. Tax Counsel, American Bankers Ass'n, Washington, D. C., for amicus curiae.

GIBBONS, Circuit Judge.

These appeals grow out of three separate proceedings in the district court for the enforcement, pursuant to 26 U.S.C. § 7604(b), of Internal Revenue Service (hereinafter IRS) summonses issued by Special Agent William L. Beerman in connection with an examination into the tax liabilities of Morris and Joy Kirshenbaum (hereinafter taxpayers) and the Ivy School of Professional Art, Inc. for the years 1969 through 1972. In one enforcement proceeding the respondents are three banks—Pittsburgh National Bank, Mellon Bank, N. A., and Equibank, N. A. In another the respondent is Paul Friedman, taxpayers' accountant. In the third the respondent is Ivy School of Professional Art, Inc. (herein-

after Ivy School) and Morris Kirshenbaum, its president.

Each bank summons, as amended,[1] seeks the following records pertaining to the tax-payers:

1. Ledger sheets of savings and check-ing accounts, open or closed, and sig-nature cards of each account.
2. Original deposit tickets and cancelled checks.
3. Account ledger sheets of loans and mortgages together with loan and mortgage applications and financial statements submitted by or on behalf of the taxpayers.
4. Safe deposit box applications, signa-ture cards, and entry records.
5. Cashier's checks.
6. Trust agreements, purchase and sale of stocks and/or bonds, and related documents.
7. Records of certificates of deposit.
8. Records of savings certificates.[2]

Each of these summonses also advised that the IRS was willing to provide the person-nel needed to search the banks' records and to supply its own copying equipment. Al-ternatively, each of the bank summonses noted that if the banks preferred to use their own personnel to search the records, the IRS would not require that all records be produced at the same time. Instead, the Service would first examine records in cate-gories 1, 3 and 4 of the above list in an attempt to limit the scope of its examina-tion of records in categories 2 and 5. Thereafter, the IRS would attempt to iden-tify specifically those items in categories 6,

7 and 8 it wished to examine.[3] The banks, however, did not comply voluntarily with these amended summonses.

The summons issued to Paul Friedman requested, in addition to his testimony, all books, records, memoranda, correspondence and working papers relating to the tax lia-bilities of Morris and Joy Kirshenbaum as well as Ivy School for the period 1969–1972.[4] The summons issued to Ivy School and Morris Kirshenbaum as its presi-dent directed them to produce the following documents:

(1) Bank statements (ledger sheets), can-celled checks, deposit slips and bank memoranda for all bank accounts maintained by Ivy School of Profes-sional Art Incorporated for the years 1969, 1970, 1971 and 1972.

(2) All records of income, receipts and expenses, including but not limited to general journals, general ledgers, subsidiary journals and ledgers, cash receipts books, disbursements books, payroll records and all supporting documents, including invoices, bill-ings, copies of wage and tax state-ments (Form W–2), copies of U.S. Information Forms (1099), correspon-dence, and employee expense account documentation.

(3) Corporate by-laws, stock books, and Minutes of Board of Directors' Meet-ings.

(4) All copies of Employer's Quarterly Federal Tax Returns (Forms 941) filed for the years 1969, 1970, 1971 and 1972.[5]

---

1. When the summonses were first served on the bank respondents, they notified the taxpay-ers who brought suit to enjoin the IRS from seeking compliance. That suit was dismissed by the district court for lack of plaintiff stand-ing. *Kirshenbaum v. Beerman*, 376 F.Supp. 398, 400 (W.D.Pa.1974). The banks, however, did not voluntarily comply with the summonses and the § 7604(b) enforcement proceeding fol-lowed.

Originally, IRS Special Agent Beerman served each bank with one summons request-ing specific records in connection with the tax liability of Morris and Joy Kirshenbaum d/b/a Ivy School of Professional Art, Inc. *See* Ap-

pendix at 188A–190A. By stipulation prior to the enforcement hearing, however, the IRS substituted six summonses for the original three. These new bank summonses, in addi-tion to the offer of IRS assistance and a stag-gered production schedule, discussed *infra,* made separate requests for records relating to the Kirshenbaums and Ivy School.

2. *See* Appendix at 193A–200A; 569A–572A.

3. *Id.*

4. *Id.* at 548A.

5. *Id.* at 534A.

Kirshenbaum's testimony regarding his and his wife's tax liability for the years in question was also requested by the Ivy School summons. Neither Friedman nor Kirshenbaum, however, voluntarily complied with their summonses, and Special Agent Beerman initiated § 7604(b) enforcement proceedings in district court.

The taxpayers were permitted by the district court to intervene in the enforcement proceedings, and they attempted to resist enforcement on the ground that each summons sought evidence for a criminal prosecution. The banks resisted enforcement on two grounds: first, because the summonses were overbroad and burdensome; and second, because they could not lawfully be required to undertake, without compensation, the extensive search of records that compliance with the summonses would entail. The district court ordered that the summons against Friedman and against Ivy School be enforced in full, and that the summonses against the banks be enforced in full except for the request for records of entry into taxpayers' safe deposit boxes (*see* Category 4 above). The district court also ordered the government to reimburse the banks for the cost of the record search.[6]

The taxpayer intervenors appeal from the enforcement order in each proceeding. The IRS appeals both from the order requiring the reimbursement of the banks for the cost of the record search and from the refusal to enforce the portion of the summonses requesting the records of entry into safe deposit boxes. On appeal both the taxpayer intervenors and the banks defend the ruling exempting the production of the safe deposit entry records.

The taxpayer intervenors were unable to obtain a stay of the enforcement orders directed against Friedman and Ivy School pending appeal, and these respondents complied with the court's orders. Because of this compliance the IRS has moved to dismiss as moot the appeal from these orders. That motion was referred to the same panel to which the appeals have been assigned.

## I. THE MOTION TO DISMISS AS MOOT THE APPEALS FROM THE FRIEDMAN AND IVY SCHOOL ORDERS

■ Although Friedman has complied with the court's order, the legality of that order is still being challenged by the taxpayer intervenors. If the taxpayers were to prevail in their contention that all summonses were illegal because they were issued solely to gather evidence for use in a criminal prosecution, then the records acquired from Friedman would have been obtained unlawfully. Such a ruling could affect the possible use of these records in any subsequent criminal or civil proceeding brought against the taxpayers. The same analysis applies to the records obtained from the Ivy School. Moreover, in the Ivy School case there has been incomplete compliance with the court's order since the IRS has not yet taken Kirshenbaum's testimony.

We conclude that the motion to dismiss the appeal in the Friedman and Ivy School cases should be denied because the controversy between the IRS and the taxpayers over these records is still very much alive. In any event, the issues raised by the taxpayers in these two cases are identical to those raised in taxpayers' appeal in the bank case.

## II. THE TAXPAYERS' APPEAL

■ The district court's decision to permit intervention by the taxpayers in the three enforcement proceedings is not an issue in these appeals.[7] Nor is there any issue about the amenability to process of books and records in the possession of an

---

6. The district court opinion is reported at 388 F.Supp. 963 (W.D.Pa.1975).

7. The district court permitted taxpayers to intervene because Special Agent Beerman had stated on the record that he was conducting a criminal investigation. 388 F.Supp. at 965–66.

This is one of the instances mentioned in *Reisman v. Caplin,* 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459, 465 where intervention might be appropriate. *See Donaldson v. United States,* 400 U.S. 517, 528–30, 91 S.Ct. 534, 541–42, 27 L.Ed.2d 580, 587–89 (1971).

accountant.[8] The taxpayers contend, however, that IRS Special Agent Beerman is investigating them solely to obtain evidence of violations of the criminal provisions of the tax laws, and that 26 U.S.C. § 7602 does not permit such a use of an administrative summons.

The standards for judicial enforcement of a § 7602 summons are found in *Donaldson v. United States, supra,* and explained by Chief Judge Seitz for this court in *United States v. McCarthy,* 514 F.2d 368 (3d Cir. 1975), and more recently by Judge Forman in *United States v. Lafko,* 520 F.2d 622 (3d Cir. 1975). These cases recognize that the IRS has no authority to conduct a criminal investigation through the use of a § 7602 civil summons.[9] But if (1) the Intelligence Division of the IRS has not yet recommended prosecution, (2) the investigating agent has not already formed a firm purpose to recommend prosecution, (3) the summons is not being used to harass the taxpayer and (4) the material referred to in the summons has not already been inspected by the government, these cases hold that the mere fact that criminal as well as civil liability may result will not prevent judicial enforcement.[10] In this case, after an evidentiary hearing, the record discloses that no recommendation for prosecution had been made either by Special Agent Beerman or by others in the IRS before the summonses were issued. Moreover, it is not contended that the taxpayers are being harassed by the summonses or that the government has previously examined or already possesses the requested records. The sole bar to judicial enforcement, then, would be a finding that the Special Agent had a firm purpose to recommend prosecution. Agent Beerman, however, testified that he was not ready to make such a recommendation because even at the time of the hearing he had not reached a conclusion with respect to criminal tax liability. The district court credited this uncontradicted testimony and concluded that the summonses should be enforced. To hold on the basis of this record that the district court erred in enforcing the summonses we would have to disregard the teaching of *Donaldson v. United States, supra, United States v. McCarthy, supra,* and *United States v. Lafko, supra,* and create a *per se* rule that the issuance of a § 7602 summons by a Special Agent having power to recom-

---

**8.** *See Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).

**9.** No court has given a thorough or persuasive justification for this construction of 26 U.S.C. § 7602 which appears to have originated in an opinion by Judge Wyzanski in *United States v. O'Connor,* 118 F.Supp. 248 (D.Mass.1953), and to have been assumed, rather than explained, ever since. Judge Wyzanski reasoned:

> The Constitution of the United States, the statutes, the traditions of our law, the deep rooted preferences of our people speak clearly. They recognize the primary and nearly exclusive role of the Grand Jury as the agency of compulsory disclosure. That is the inquisitorial body provided by our fundamental law to subpoena documents required in advance of a criminal trial, and in the preparation of an indictment or its particularization. . . . 118 F.Supp. at 250–51.

The paragraph has a nice ring, but it ignores the reality that grand jury subpoenas are issued as a matter of course by the Department of Justice, not by the grand jury. *See In re Grand Jury Proceedings,* 486 F.2d 85 (3d Cir. 1973). It is hard to imagine why Congress could not entrust criminal law enforcement of the Internal Revenue Code to an executive branch department other than or in addition to the Justice Department. The difference between a summons returnable before an IRS agent and a subpoena returnable before a grand jury is in the real world slight.

The critical question, however, is what Congress intended in § 7602 and its predecessors, as well as in 26 U.S.C. § 7801(a) which authorizes the Secretary of the Treasury to administer and enforce the provisions of the Internal Revenue Code. The Intelligence Division of the IRS is organized to carry out the broad enforcement responsibilities of the Treasury Secretary under § 7801(a). Since Judge Wyzanski's opinion in 1953, no case which has addressed the issue of the scope of a § 7602 summons has explored the legislative intention in any depth. Nor do we, since the *United States v. O'Connor* construction has been accepted by the Supreme Court. *See, e. g., Donaldson v. United States, supra* at 533.

**10.** *Donaldson v. United States, supra* 400 U.S. at 532–36, 91 S.Ct. at 543–45, 27 L.Ed.2d at 590–92; *United States v. Lafko, supra,* 520 F.2d 624–25; *United States v. McCarthy, supra,* 514 F.2d at 373–376.

mend prosecution is always improper. Under the authorities we cannot do so.

## III. THE SAFE DEPOSIT BOX RECORDS

■ The district court held that it would enforce a § 7602 summons against a bank in connection with an investigation of a customer only if the IRS has some basis to believe: (1) that the records exist; (2) that the records have some bearing on the customers' tax liability; and (3) that all other and less costly alternatives to obtain the same documents have been exhausted. Applying this test the court concluded that the banks should not be required to conduct a search for records of taxpayers' entries to their safe deposit box because such a search could lead only to criminal evidence and would not be relevant to any proper civil purpose for which the § 7602 summons was issued.[11]

The banks concede that records of entry to safe deposit boxes exist. They contend, however, that in order to comply with the summonses they would be required to conduct a search, first at each branch which offers the safe deposit box service to determine if taxpayers have rented a box, and then at the appropriate branch for the records of entry. While acknowledging that in some instances they may be required to conduct such a search, the banks maintain that the government has made an insufficient showing in this case of the relevancy of the requested records to the determination of the taxpayers' tax liability or that less costly alternatives to obtaining the requested information have already been exhausted.

The IRS, on the other hand, advances two theories to support the relevance of its request for the records of taxpayers' entry to their safe deposit box. First, dates of entry to safe deposit boxes might correspond to dates when unreported cash payments were made by third parties. Second, if the government elects to reconstruct the taxpayers' income by utilizing a net worth and expenditures method, the entry records would be highly significant in determining whether withdrawals from a bank account had been placed in a safe deposit box or whether expenditures or bank deposits were being made from a cash source accumulated in a safe deposit box. No showing was made in the district court, however, that the investigation had developed to the point where the IRS could confidently assess the merits of either theory. But Paul Sullivan, Chief of the Intelligence Division of the Pittsburgh District, and Special Agent Beerman did testify that the entry records would be relevant to the net worth and expenditures method of reconstructing taxpayers' income.[12] Moreover, the taxpayers informed the IRS that they had done business with the bank respondents.[13]

We conclude that the district court's order imposed a burden on the government with respect to the banks' records of taxpayers' safe deposit entries beyond any authorized by the Supreme Court or by this court. In § 7604(b) proceedings, as well as elsewhere,[14] the courts have been vigilant in preventing abuse of the subpoena power by executive branch enforcement agencies. But we have never exercised such vigilance to the extent of charting in detail the sequence of steps in an investigation. Mindful that in tax investigations, as elsewhere, the executive branch enforcement agencies are working under constraints imposed by statutes of limitations, the courts should not, as a precondition to enforcement, preclude simultaneous lines of inquiry, some of which might subsequently prove to be fruitless. Where, as in this case, the Service has a sound basis for concluding that a taxpay-

---

11. 388 F.Supp. at 969–70.

12. Appendix at 432A (Sullivan testimony); 213A–216A (Beerman testimony). Thus, contrary to the suggestion in the dissenting opinion, the safe deposit records could be used affirmatively by the government. But use of a § 7602 summons to obtain evidence in anticipa-

tion of a taxpayer defense would seem a valid civil purpose as well.

13. *Id.* at 414A (Sullivan testimony).

14. *See, e. g., In re Grand Jury Proceedings, supra.*

er has done business with a third party who may be expected to maintain records which could help to establish the former's tax liability, a reasonable record search should be ordered.[15] We hold that the district court erred in refusing to enforce the portion of the summonses requesting taxpayers' safe deposit box entry records.

## IV. THE ORDER IMPOSING COSTS

■ In the amended summonses the IRS offered the banks the use of its own personnel to search and copy taxpayers' bank records. The district court rejected this alternative to the imposition upon the government of the costs of the required records search because it would permit access by IRS agents to records of transactions involving other customers who were not the subjects of a § 7602 summons. We agree with the district court that the banks were free to decline this offer of IRS assistance.[16]

This decision, however, presented the banks with the problem of conducting the required record searches by utilizing their own personnel. The resulting cost burden, viewed in light of the IRS's overall enforcement effort rather than in the context of a single enforcement proceeding, is not inconsequential. A witness of the Pittsburgh National Bank testified that the average cost of compliance with an IRS summons was $5.00 per hour, and that a recent summons had required the expenditure of 38 hours.[17] If this instance represented an average expenditure of time, compliance with each summons would cost approximately $190. A witness for Equibank testi-

fied that compliance with IRS summonses required the full attention of the equivalent of two employees at an annual salary of $6,000, plus the expenditure of ½ hour per branch (86 branches) at $5.77 an hour for each summons. Since Equibank received 67 summonses in 1973, the average cost of compliance was $430.00 per summons.[18] A witness for Mellon Bank testified that the average cost per hour for employees complying with IRS summonses was $5.12.[19] The government does not dispute the accuracy of these figures. Thus, we may assume that each summons may cost the responding bank in employee labor something between $100 and $500, depending on the bank's size, the number of branches it operates, and the manner in which it keeps its records. For some banks the cost of compliance may exceed $35,000 a year.

### A. The banks' constitutional arguments

■ The banks contend that to require them to incur the foregoing expenses without reimbursement would violate their rights under the fourth and fifth amendments. Specifically, they urge that such a requirement constitutes an unreasonable search, deprives them of property without due process and amounts to a taking of property without just compensation.

To the extent that the banks' fourth amendment contention implicates the values of privacy protected by that amendment, it must fail because of our holding that the summonses were reasonable and should be enforced. The fourth amendment does have a property as well as privacy aspect in that it protects against seizures

15. *See United States v. Bisceglia,* 420 U.S. 141, 146, 95 S.Ct. 915, 919, 43 L.Ed.2d 88, 93 (1975); *United States v. Powell,* 379 U.S. 48, 56, 85 S.Ct. 248, 254, 13 L.Ed.2d 112, 118 (1954). *Cf. Civil Aeronautic Board v. Hermann,* 353 U.S. 322, 77 S.Ct. 804, 1 L.Ed.2d 852 (1957).

16. We do not reach the question whether there is any affirmative obligation on the banks to decline such assistance in the interest of customer confidentiality. *See, e. g., United States v. Dauphin Deposit Trust Co.,* 385 F.2d 129, 131 (3d Cir. 1967), *cert. denied,* 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1968).

17. Appendix at 373A, 379A (testimony of Walter J. Wilson, Jr., Vice-President and Cashier, Operations Division, Pittsburgh National Bank).

18. *Id.* at 349A, 352A, 363A–64A (testimony of Robert Brubaker, Vice President of Operations, Equibank).

19. *Id.* at 304A–05A (testimony of Richard L. Lechnar, Assistant Operations Officer and Manager of the Records Management Section, Mellon Bank).

as well as invasions of privacy. But we have been referred to no authority for the proposition that the seizure of the time and effort required for compliance with a summons or subpoena duces tecum is within the ambit of the fourth amendment. Certainly *United States v. Dauphin Deposit Trust Co., supra,* on which the banks rely, does not so hold.

Any fifth amendment due process or taking contention would seem to be foreclosed by the Supreme Court's decision in *Hurtado v. United States,* 410 U.S. 578, 93 S.Ct. 1157, 35 L.Ed.2d 508 (1973), which held that 28 U.S.C. § 1821, providing for the reimbursement of incarcerated material witnesses at only one dollar a day did not violate the fifth amendment because the giving of evidence was a public duty owed to the government by everyone.[20] Any doubt on this score is resolved by the holding in *California Bankers Assn. v. Schultz,* 416 U.S. 21, 50, 94 S.Ct. 1494, 1512, 39 L.Ed.2d 812, 834 (1974), that the record keeping and microfilming requirements in the Bank Secrecy Act of 1970,[21] are constitutional. If the banks are entitled to reimbursement for the cost of complying with the summonses, it must be on the basis of some authority less than constitutional.

### B. *The banks' statutory arguments*

The government points out that there is no provision in Chapter 78 of the Internal Revenue Code, 26 U.S.C. § 7601 *et seq.,* which grants explicit authority to the court to order reimbursement for the cost of compliance with summonses. The government relies, as well, on the general rule that in the absence of a statute expressly authorizing it, courts will not ordinarily award costs against the United States.[22] That rule, which was originally codified in 28 U.S.C. § 2412(a)[23] was, of course, changed in 1966.[24] But 28 U.S.C. § 2412, as amended, affords no comfort to the banks, since it permits an award only of those costs which under 28 U.S.C. § 1920 would be made to the "prevailing party". In this enforcement proceeding the United States is the prevailing party. Moreover, § 1920 contains no provision for payment of the cost of searching for papers to be used in another proceeding.[25]

The banks, however, respond to this argument by referring to 5 U.S.C. § 503 which provides that:

> (a) For the purpose of this section, "agency" has the meaning given it by section 5721 of this title.[26]
>
> (b) A witness is entitled to the fees and allowances allowed by statute for witnesses in the courts of the United States when—
>
>> (1) he is subpenaed under section 304(a) of this title; or
>>
>> (2) he is subpenaed to and appears at a hearing before an agency authorized by law to hold hearings and subpena witnesses to attend the hearings.

Two circuits have held that § 503(b) authorizes the payment of witness fees to witnesses served with a § 7602 summons. *United States v. Coson,* 515 F.2d 906 (9th Cir. 1975), *cert. denied,* 423 U.S. 927, 96 S.Ct. 272, 46 L.Ed.2d 253, 44 U.S.L.W. 3263

---

**20.** *See, e. g., United States v. Bryan,* 339 U.S. 323, 333, 70 S.Ct. 724, 731, 94 L.Ed. 884, 891 (1950). *Blackmer v. United States,* 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375 (1932); *Blair v. United States,* 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919).

**21.** Act of October 26, 1970, Pub.L. No. 91–508, 84 Stat. 1114, 12 U.S.C. §§ 1730d, 1829b, 1951–1959, and 31 U.S.C. §§ 1051–1062, 1081–1083, 1101–1105, 1121–1122.

**22.** *See, e. g., United States v. Chemical Foundation,* 272 U.S. 1, 20–21, 47 S.Ct. 1, 8, 71 L.Ed. 131, 145 (1926).

**23.** Act of June 25, 1948, ch. 646, 62 Stat. 973.

**24.** Act of July 18, 1966, Pub.L. No. 89–507, § 1, 80 Stat. 308, 28 U.S.C. § 2412.

**25.** 28 U.S.C. § 1920(4) allows "[f]ees for exemplification and copies of papers necessarily obtained for use in the case." In this instance the "case" is the enforcement proceeding. *See also* Rule 54(d), Fed.R.Civ.P.

**26.** 5 U.S.C. § 5721 states in relevant part that:
> For the purpose of this subchapter—
>> (1) "agency" means—
>>> (A) an Executive agency . . . ..

(1975); *Roberts v. United States,* 397 F.2d 968 (5th Cir. 1968). The *Roberts* case, on which the *Coson* court relied, concluded that an IRS investigation into tax liability was a "hearing" within the meaning of § 503(b)(2). Assuming that this construction of § 503(b)(2) is correct, and thus that it supplements Chapter 78 of the Internal Revenue Code, the banks' argument is advanced only to the point of determining what fees and allowances are available to witnesses in the courts of the United States. These are specified as $20 for each day's attendance and for the time spent in travel, and 10 cents per mile for going from and returning to the witness' residence. 28 U.S.C. § 1821. Obviously the banks in this case seek a good deal more.

The banks also refer to Rule 45(b), Fed.R. Civ.P., which provides that:

A subpoena may also command the person to whom it is directed to produce the books, papers, documents, or tangible things designated therein; but the court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, may (1) quash or modify the subpoena if it is unreasonable and oppressive or (2) condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things.

They contend that this rule applies by virtue of Rule 81(a)(3), Fed.R.Civ.P., which states in pertinent part that:

These rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings.

But certainly Rule 45(b) does not literally apply to the factual setting of this case since it refers to subpoenas for attendance in court, not those for attendance at administrative agency proceedings.[27] Moreover, the Notes of the Advisory Committee on Rule 45 suggest it does not apply to enforcement of subpoenas issued by administrative officers.[28]

We conclude that there is no express provision of any statute or rule which authorizes the district court in a proceeding to enforce a § 7602 summons to order the government to reimburse the banks for the expenses of compliance.

## C. *The banks' non-statutory argument*

But even assuming that reimbursement is neither constitutionally compelled nor specifically authorized by statute, the banks urge that there is ample justification for judicial lawmaking on this issue. The argument is that the very nature of the enforcement scheme implies that there has been a grant from Congress to the courts of the power to fashion a reasonable rule for the protection of persons and organizations summoned by the IRS.

In 1894 the Supreme Court announced that:

[t]he inquiry whether a witness before the Commission is bound to answer a particular question propounded to him, or to produce books, papers, etc., in his possession and called for by that body, is one that cannot be committed to a subordinate administrative or executive tribunal for final determination. *Interstate Commerce Comm. v. Brimson,* 154 U.S. 447, 485, 14 S.Ct. 1125, 1136, 38 L.Ed. 1047, 1060 (1894).

Congress has since acquiesced in that judgment, entrusting the enforcement of administrative process for the production of wit-

---

**27.** Rule 147 of the Rules of Practice and Procedure of the Tax Court of the United States, adopted pursuant to 26 U.S.C. § 7453, is identical to Rule 45, Fed.R.Civ.P. Thus, if this case involved a Tax Court subpoena duces tecum, that court could condition compliance on the advancement of the reasonable costs of producing the books, papers or records requested.

**28.** Fed.R.Civ.P. 45, Notes of Advisory Committee on Rules and Historical Notes.

nesses or papers to the courts.[29] Section 7604 follows the classic model, without in any way purporting to limit the power of the judiciary to choose an appropriate rule of decision in an enforcement proceeding. In other subpoena enforcement proceedings the courts have looked to non-statutory sources for appropriate guidance.[30] Nor is the phenomenon of finding authority to fashion an appropriate non-constitutional and non-statutory rule of decision from a grant of jurisdiction to decide cases and controversies unique to the subpoena enforcement context.[31]

We conclude that from the very fact that enforcement of a § 7602 summons is by § 7604(b) entrusted to the judiciary, this court has the power to fashion appropriate rules as to the fairness of the enforcement order. But to do so we must examine the usual sources of judge-made rules of decision. Even if not literally applicable, Rule 45(b), Fed.R.Civ.P., serves as significant precedent [32] disclosing a broad congressional judgment with respect to fairness in subpoena enforcement proceedings. Using Rule 45(b) as a convenient analogy, the court can modify the § 7602 summons if it is unreasonable or oppressive in scope, and it can condition a denial of enforcement in a § 7604(b) proceeding on the reimbursement by the government of the reasonable cost of producing the books, papers or records requested.

The application of such a rule, however, requires individualized consideration rather than generalization. In the case before us the district court chose to lay down a general rule that in all § 7604(b) enforcement proceedings reimbursement would be required in order to encourage an IRS policy of restraint.[33] This general rule, we think, went too far. When a respondent in a § 7604(b) enforcement proceeding urges excessive burden and resists an order that is not conditioned upon reimbursement, it should also be required to produce evidence of the expense likely to be incurred in compliance with the summons. Moreover, not all recipients of a § 7602 summons are similarly situated. A manufacturer, who may only have dealt with a taxpayer quite casually and occasionally, for example, might not be required, as a part of the cost of doing business, to make an unreimbursed record search. A bank, however, whose business is the facilitation of financial transactions, and which keeps records of all customer dealings as a matter of course, if not law,[34] may be required to do so. Without precise findings on the extent of the burden of the record search required in this case, we are in no position to lay down more precise guidelines. Undoubtedly, guidelines

---

**29.** *But see McGrain v. Daugherty,* 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927), which holds that the congressional subpoena is self-executing.

**30.** *See, e. g., Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 212, 66 S.Ct. 494, 507, 90 L.Ed. 614, 631 (1946); *In re Grand Jury Proceedings, supra,* 486 F.2d at 90–91.

**31.** *See, e. g., Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (admiralty and maritime jurisdiction); *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (§ 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a)). *See also Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (power to make substantive rules of decision implied from federal Constitution).

**32.** *See Cisternas-Estay v. Immigration & Nat. Serv.,* 531 F.2d 155 Civil No. 75–1261 (3d Cir., Feb. 25, 1976) (Gibbons, J., dissenting); *Giambanco v. Immigration & Nat. Serv.,* 531 F.2d 141 Civil No. 75–1401 (3d Cir., Feb. 25, 1976). *See generally,* Landis, Statutes and the Sources of Law, in Harvard Legal Essays 213 (1934).

**33.** The district court stated:

My reasoning is obvious. Faced with the obligation to pay the cost of such a search, the IRS will impose upon itself those limitations which will insure that the records sought do exist and are in possession of the third parties upon whom the summonses are issued, that the records do have a bearing on the taxpayer's income tax liability, and that the IRS has exhausted all other and less costly alternatives to obtain the same documents. 388 F.Supp. at 970.

**34.** *See, e. g.,* the Bank Secrecy Act of 1970, *supra* note 21.

will emerge in the course of future § 7604(b) enforcement proceedings.

We conclude that the district court possessed the power to require the government to reimburse the banks for the reasonable cost of production of the requested bank records. However, we hold that before such a condition is imposed the district court must make an individualized determination that the cost involved in complying with the summons in question exceeds that which the respondent may reasonably be expected to bear as a cost of doing business.

## V. CONCLUSION

The orders appealed from, other than those provisions of the order in *United States v. Pittsburgh Nat'l Bank*, 388 F.Supp. 963, D.C., Civil Action No. 74–346, relating to safe deposit entry records and reimbursement, will be affirmed. The provision of the order in *Pittsburgh Nat'l Bank* refusing to enforce the summonses for records of taxpayers' safe deposit box entries will be reversed. The provision of that order requiring the government to reimburse the banks for the cost of their record search will be vacated and the issue remanded to the district court for further proceedings consistent with this opinion.

ROSENN, Circuit Judge (concurring and dissenting).

I concur in the partial affirmance of the judgment of the district court and in the remand on the issue of reimbursement to the banks. I would, however, also affirm that portion of the judgment of the district court which denied enforcement of the summons as it related to safe deposit box entry records.

The Government conceded at oral argument before this court that the information which it could derive from those entry records constitutes potential rebuttal evidence only. It was unable to specify how the records might establish civil liability. In its brief to this court, the Government asserted:

> When faced with a reconstruction of income based on the net worth method, a favorite defense of the taxpayer is the so-called "cash hoard" defense. Under this defense, the claim is made that the apparent increase in net worth came not from taxable income received during the tax year but rather from undeposited cash which the taxpayer had on hand at the beginning of the year at issue.

Entry records to a safe deposit box, according to the Government, might tend to indicate whether withdrawals from a bank account were in fact deposited in the box and a "cash hoard" accumulated in any one year. The entry records might therefore aid the IRS in refuting a taxpayer's defense on this ground. Special Agent Beerman and Chief Sullivan of the IRS Intelligence Division for the Pittsburgh District testified to the same effect in the district court.[1]

Among the purposes for which a section 7602[2] summons may issue, I find none which even arguably encompasses the accumulation of rebuttal evidence against a hypothetical taxpayer defense. As I see no

---

1. Beerman testified:

   [I]t would help corroborate if there were allegations that he was withdrawing large amounts of cash and depositing them in the box.

   Sullivan also testified as follows:

   Number one would be if there were an allegation or we were looking for a cash hoard. If our investigation of the taxpayer's account discloses a stream of cash deposits, we would put that together with the safe deposit box, that he entered the safe deposit box the day before he made cash deposits each and every time. It may indicate that his income is from a cash hoard which might not currently be a taxable income.

   This vague testimony seems to indicate that the records of entry to the safe deposit box were not to be used affirmatively to reconstruct the taxpayer's net income or to determine tax liability.

2. 26 U.S.C. § 7602 (1971) authorizes the issuance of a summons:

   [f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . or collecting any such liability . . . .

other civil purpose to be served by information in entry records to a safe deposit box, I would affirm the district court's refusal to enforce the summons to that extent.

Although I agree that the remainder of the summons should be enforced, I believe the majority did not sufficiently acknowledge the argument of the taxpayers and the banks that the summons was not issued in "good faith" as required by the *Donaldson* decision. This court in *United States v. McCarthy, supra,* 514 F.2d at 375, stated that the good faith of IRS agents was brought into question upon a showing that they "had no intention of pursuing any civil remedies." The seeds of doubt were thus sown by Special Agent Beerman's initial testimony, noted by the majority at footnote 7, that "[t]he prime function of the investigation is to determine if [a] criminal violation has occurred."

Despite Beerman's original statements, he later testified that the investigation had both a civil and a criminal purpose. The district court also found this investigation typical of IRS investigations involving the possibility of civil remedies in addition to criminal sanctions.

The court concluded that the taxpayers and the banks had failed to sustain their burden of proof that the IRS contemplated purely criminal penalties in the instant case. I too am persuaded that the investigation was mounted to uncover civil liability as well as criminal violations and that the summons was therefore issued in "good faith" within the meaning given that term in *United States v. McCarthy.*

Finally, I would amplify the guidelines set forth by the majority pertaining to reimbursement to banks for the costs of complying with the IRS summons. The majority instructs the district court to exclude any amount which the banks "may reasonably be expected to bear as a cost of doing business." More specifically, I believe reimbursement should be available only for reasonable overtime or additional clerical help and machine costs incurred as a result of compliance with the summons. The IRS should not be required to contribute to the

banks' overhead, depreciation, or other normal operating costs. The burden of proving expenses over and above cost of doing business which would be normally incurred regardless of the summons should be placed squarely on the banks.

For the foregoing reasons, I concur in Parts I, II, and IV of the majority opinion and dissent from Part III.