591 F.2d 182
 1979-1 Trade Cases 62,439
 FEDERAL TRADE COMMISSION, Petitioner-Appellee,
v.
David ROCKEFELLER, Chairman, and the Chase Manhattan
Corporation, Respondents-Appellants,
Donald C. Platten, Chairman, and Chemical New York
Corporation, Respondents-Appellants,
Walter B. Wriston, Chairman, and Citicorp, Respondents-Appellants,
Roger E. Anderson, Chairman, and Continental Illinois
Corporation, Respondents-Appellants,
James H. Higgins, Chairman, and Mellon National Corporation,
Respondents-Appellants,
E. C. Patterson, Chairman, and J. P. Morgan & Co.,
Incorporated, Respondents-Appellants,
and
A. W. Clausen, President, and BankAmerica Corporation,
Respondents-Appellants.
 No. 285, Docket 78-6120.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 20, 1978.
Decided Jan. 18, 1979.
 
 Warren S. Grimes, Atty., Washington, D. C. (Michael N. Sohn, Gen. Counsel, Gerald P. Norton, Deputy Gen. Counsel, W. Dennis Cross, Asst. Gen. Counsel, Washington, D. C., of counsel), for petitioner-appellee.
 John E. Hoffman, Jr., New York City (Shearman & Sterling, Francisca A. Sabadie, New York City, of counsel), for respondents-appellants Walter B. Wriston and Citicorp.
 Milbank, Tweed, Hadley & McCloy, New York City (Edward J. Reilly, Kenneth A. Perko, Jr., Peter A. Copeland, New York City, of counsel), for respondents-appellants David Rockefeller and The Chase Manhattan Corporation.
 Cravath, Swaine & Moore, New York City (Ralph L. McAfee, Richard S. Simmons, New York City, David G. Carlson, New York City, of counsel), for respondents-appellants Donald C. Platten and Chemical New York Corporation.
 Mayer, Brown & Platt, Chicago, Ill. (John Bleveans, Thaddeus J. Marciniak, Chicago, Ill., of counsel), for respondents-appellants Roger E. Anderson and Continental Illinois Corporation.
 Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa. (Joseph A. Katarincic, Michael R. Plummer, Pittsburgh, Pa., of counsel), for respondents-appellants James H. Higgins and Mellon National Corporation.
 Davis, Polk & Wardwell, New York City (Taggart Whipple, Steven F. Goldstone, Scott W. Muller, New York City, of counsel), for respondents-appellants E. C. Patterson and J. P. Morgan & Co., Inc.
 Wilmer, Cutler & Pickering, Washington, D. C. (Arnold M. Lerman, Robert G. Wilson, Washington, D. C., of counsel), Bela Szathmary and Ralph Aiello, New York City, Bank of America, N.T. & S.A., for respondents-appellants A. W. Clausen and BankAmerica Corporation.
 Before FEINBERG, MULLIGAN, Circuit Judges, and NEWMAN, District judge.*
 FEINBERG, Circuit Judge:
 
 
 1
 Seven bank holding companies and a principal officer of each, respondents in this action, appeal from an order of the United States District Court for the Southern District of New York, Morris E. Lasker, J., enforcing subpoenas of plaintiff Federal Trade Commission directed to appellants and seeking information regarding the connections, including interlocking directorates, between energy companies and appellant financial institutions and their affiliates. The principal issues on appeal are whether the Commission exceeded its power in issuing the subpoenas and whether compliance with them would be unduly burdensome. Although the basis of our decision on the first question differs somewhat from that of the district judge, we agree with him that the subpoenas are neither unauthorized nor, as now limited, offensive. Therefore, we affirm the judgment of the district court.
 
 
 2
 * This litigation stems from a 1973 Congressional authorization of $1 million for the Commission to "study . . . the energy industry" and "report to the Committee and to the Congress at the earliest practicable moment consistent with compiling an adequate study."[1] In response to this directive, the Commission in April 1974 issued three resolutions authorizing its staff to use compulsory process to obtain information on the "structure, conduct and performance" of the natural gas, coal and nuclear energy industries.[2] In September 1974, the Commission issued a fourth resolution, similarly authorizing use of compulsory process to acquire information on
 
 
 3
 the extent and effects of direct and indirect interlocking directorates, and other interlocking personnel and business relationships among domestic petroleum companies and between such companies and financial institutions . . . .[3]
 
 
 4
 Each of the resolutions cited sections 6, 9 and 10 of the Federal Trade Commission Act (the Act), 15 U.S.C. §§ 46, 49 and 50, as authority to conduct the investigation.
 
 
 5
 The Commission tells us that while most of the remainder of its Energy Study, launched over four years ago, has now been completed and reported to Congress, a significant aspect of the Study is not yet done, the portion relating to the extent and nature of the relationships between energy companies and financial institutions. The course of this case explains why this is so. The Commission first issued subpoenas directly to the bank subsidiaries of a number of appellant institutions in November 1974. These subpoenas were challenged and the Commission never sought to enforce them. In July 1975, the Commission served the subpoenas now under review on appellant bank holding companies and their executives. Challenging the Commission's authority to "investigate" banks, appellants moved before the Commission to limit or quash the subpoenas. Appellants also argued that compliance would be unduly burdensome. (The issues relating to the latter aspect of this case are discussed in Part III Infra.)
 
 
 6
 In August 1975, the Commission denied the motions to quash, and shortly thereafter litigation began in two federal district courts. In September 1975, some of the financial institutions sought pre-enforcement review of the Commission's subpoenas in the Southern District of New York. In December 1975, the Commission commenced an enforcement proceeding in the District of Columbia. The former actions were dismissed by Judge Frankel in favor of the Commission's enforcement proceeding in the District of Columbia. First Nat'l City Bank v. FTC, CCH 1975-2 Trade Cas. P 60671 (S.D.N.Y.1975), aff'd, 538 F.2d 937 (2d Cir. 1976). In April 1976, the District of Columbia court, on the motion of the institutions, transferred the Commission's enforcement proceeding to the Southern District pursuant to 28 U.S.C. § 1404(a). Thereafter, the case proceeded in that court. In November 1977, after the subpoenas had been narrowed, Judge Lasker held that the Commission had authority to issue the subpoenas under section 9 of the Act, 15 U.S.C. § 49. 441 F.Supp. 234.[4] Following proceedings on the issue of burdensomeness before Magistrate Schreiber, the subpoenas were again narrowed. Judge Lasker's order, entered in June 1978, also incorporated a system of phased compliance, which is described in Part III Infra. This appeal followed, and in August 1978 appellants obtained from a panel of this court a stay of the subpoenas pending disposition of an expedited appeal.[5]
 
 II
 
 7
 In their arguments to us, the parties frequently quote from those portions of the Federal Trade Commission Act upon which they rely, and it may be helpful at the outset to reproduce in one place all the sections of the Act relevant to this appeal. Section 6 of the Act, 15 U.S.C. § 46, provides in pertinent part:
 
 The Commission shall also have power
 
 8
 (a) To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any person, partnership, or corporation engaged in or whose business affects commerce, Excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other persons, partnerships, and corporations.
 
 
 9
 (b) To require, by general or special orders, persons, partnerships, and corporations, engaged in or whose business affects commerce, Excepting banks and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the Commission in such form as the Commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective persons, partnerships, and corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the Commission may prescribe, and shall be filed with the Commission within such reasonable period as the Commission may prescribe, unless additional time be granted in any case by the Commission.
 
 
 10
 Provided, That the exception of "banks and common carriers subject to the Act to regulate commerce" From the Commission's powers defined in clauses (a) and (b) of this section, shall not be construed to limit the Commission's authority to gather and compile information, to investigate, or to require reports or answers from, Any person, partnership, or corporation to the extent that such action is necessary to the investigation of any person, partnership, or corporation, group of persons, partnerships, or corporations, or Industry which is not engaged or is engaged only incidentally in banking or in business as a common carrier subject to the Act to regulate commerce. (Emphasis supplied.)
 
 
 11
 Section 9 of the Act, 15 U.S.C. § 49, provides in relevant part:
 
 
 12
 For the purposes of sections 41 to 46 and 47 to 58 of this title the Commission, or its duly authorized agent or agents, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any documentary evidence of any person, partnership, or corporation being investigated or proceeded against; and the Commission shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation. . . .
 
 
 13
 Judge Lasker held that the last-quoted section was sufficient to authorize the subpoenas under attack because they were issued in connection with a concededly "lawfully authorized study of the energy industry" and "the information sought . . . is relevant, and possibly essential" to that study. 441 F.Supp. at 240, 241. Appellants rejoin that the Commission never relied on section 9 standing alone, and properly so, because that section "is not an independent grant of authority to or source of substantive power for the Commission . . . ." Rather, section 6 must govern, and subsection (a) exempts "banks" from Commission investigations. True, the proviso at the end of section 6 modifies the exemption to allow the Commission to gather information from banking institutions like appellants but only to the extent that such action is Necessary to the energy investigation, a standard, appellants argue, that is not met here.
 
 
 14
 Appellants are correct in asserting that in ruling on their motion to quash the subpoenas, the Commission did not appear to rely on section 9 independently of other sections. Although all four of the Commission's resolutions did refer to section 9, see notes 2 and 3 Supra, they did so only when coupled with references to section 6. Further, the Commission's ruling stated in part:
 
 
 15
 1. The Trans-Alaska Pipeline Authorization Act, Pub.L.93-153, 87 Stat. 576 (1973) amended Section 6 of the Federal Trade Commission Act (15 U.S.C. § 46) to provide that the Commission may investigate banks "to the extent that such action is necessary to the investigation of any . . . industry which is not engaged . . . in banking." The amendment grants the Commission investigatory jurisdiction over banks with regard to all subjects "necessary" to the resolution of issues in an investigation of an industry not engaged in banking. The effect of the amendment is to define the permissible scope of an investigation touching on banks and to require that the subject matter of such an inquiry arise out of a matter properly under investigation in this instance, competitive conditions in the energy industry.
 
 
 16
 3. The phrase "to the extent . . . necessary" in the 1973 amendment to Section 6 of the Federal Trade Commission Act has the effect of delimiting the permissible scope of an investigation touching on banks. It does not require that information subpoenaed from a bank be demonstrably unavailable from any other source, nor that the Commission have exhausted every other possible avenue of inquiry before compelling a bank to produce documents.
 
 
 17
 4. The documents sought by the subpoena, as limited above, are both relevant and necessary to the exploration of matters within the permissible scope of the Commission's investigation into competitive conditions in the energy industry.[6]
 
 
 18
 Indeed, Judge Lasker noted that the Commission's ruling never mentioned section 9 of the Act. 441 F.Supp. at 238. Nevertheless, the judge viewed the issue before him as simply whether the Commission has authority to subpoena documents from banks, not whether it has authority to investigate banks. On this view, the judge ruled that section 9 required an affirmative answer because the power to subpoena under that section
 
 
 19
 extends not only to those who are not targets of an investigation, but also to those who, because of an exemption such as is enjoyed by these respondents, can never be targets.
 
 441 F.Supp. at 240.[7]
 
 20
 We share much of the views of the district judge, particularly his obvious concern over the "contorted and lugubrious history" of the litigation. 441 F.Supp. at 239. One may hope that solution to the energy crisis, the obvious impetus for Congressional authorization of the Commission's study, does not heavily depend upon the Commission's obtaining responses to its subpoenas. It is now over five years since the Congressional directive, over four years since the Commission's resolutions, and over three years since issuance of the subpoenas. Yet, the subpoenas remain unanswered. Nevertheless, we are reluctant to justify the subpoenas, as Judge Lasker did, on section 9 standing alone, a basis not used by the Commission. Cf. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943); K. Davis, Administrative Law Treatise 581 (1970 Supp.). We believe that, in any event, the banks are more than mere repositories of information concerning the target of the Commission's investigation of the energy industry. In a real sense, since the Commission is interested in the relationship between the energy companies and financial institutions, appellants are ancillary targets of the investigation. For that reason, we can look to section 6 of the Federal Trade Commission Act, because that section defines the Commission's investigative jurisdiction. This does no more than change the path by which we reach the same result as Judge Lasker, however, because we hold that the subpoenas are clearly justified under section 6.
 
 
 21
 The 1973 amendment to section 6, which added the proviso quoted above, Pub.L.93-153 § 408(e), 87 Stat. 592, clearly authorized the Commission to "gather and compile information" from, and to "investigate," banks "to the extent that such action is necessary to the investigation" of non-banking targets. Appellants concede that the energy investigation is authorized but argue that the subpoenas to them are not "necessary" to that investigation. According to appellants, the "information sought by a subpoena directed to a bank must have a demonstrably significant relationship to a proper Commission investigation" and the Commission must pursue "reasonably available alternatives" before issuing compulsory process to banks. Appellants derive this formula from dictionary definitions of "necessary" as "inescapable" or "absolutely needed." Obviously, however, the word "necessary" is not always used in its most rigid sense. It is a word with various meanings, as Chief Justice Marshall pointed out in the landmark case of McCulloch v. Maryland, 4 Wheat. 316, 17 U.S. 316, 413-15, 4 L.Ed. 579 (1819). In this context, the requirement that the ancillary investigation be "necessary" to the principal investigation does not mean "absolutely needed" or "inescapable." To require the Commission to prove, as appellants urge, that the relationship between the two investigations is "demonstrably significant" would be to require the impossible, since only the material sought and withheld could demonstrably justify the request for it.
 
 
 22
 The Commission's investigatory power is broad, see United States v. Morton Salt Co., 338 U.S. 632, 641-43, 70 S.Ct. 357, 94 L.Ed. 401 (1950); FTC v. MacArthur, 532 F.2d 1135, 1140 (7th Cir. 1976), and an enactment clearly intended to augment it, such as the 1973 proviso,[8] should not be strictly or narrowly construed. We believe that the proviso requires only that the ancillary investigation of appellants arise reasonably and logically out of the main investigation of competitive conditions in the energy industry. Cf. Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); United States v. Powell, 379 U.S. 48, 53-54, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). Also, we reject, as did the Commission, the notion that "necessary" means that the Commission must pursue all other "reasonably available alternatives" before engaging in the ancillary investigation. This is not only inconsistent with what we perceive as the intent of the proviso, but is also impractical. It is frequently impossible to know what the alternative sources of information are at the start of an investigation. Appellants might reply that if that is the case then the alternative source would not be "reasonably available." But this would encourage time consuming disputes about the existence of alternative sources and the extent of the Commission's knowledge of them. We do not think that Congress intended such potential frustration of the Commission's investigative power.
 
 
 23
 We turn now to the application of the appropriate standard. In denying the motions to quash the subpoenas, see note 6 Supra, the Commission said:
 
 
 24
 As part of the Commission's Energy Study, its staff is examining the effects of interlocking directorates between energy companies and banks on competitive conditions in the energy industry. Since the availability of credit is highly important to the capital-intensive energy sector, the Commission's staff is investigating the possibility that interlocked energy companies or some segment of the industry with which they are identified receive preference in obtaining credit; the possibility that interlocked energy companies use their position to deny or limit credit available to their competitors or to a segment of the industry to which they are antagonistic; the possibility that interlocked energy companies have access to confidential credit file data of competitors; and the possibility that interlocked energy companies influence bank credit policies to encourage or inhibit various alternative energy sources and industry structures.
 
 
 25
 Necessary to the resolution of the investigatory issues just described is information concerning your client's allocation of credit among energy companies represented on its board and those not represented, credit policies which dictate such allocation, reasons for choosing directors affiliated with energy companies, and reliance on those directors' advice and participation. Therefore, the Commission may properly compel production of the subpoenaed information in order to complete its inquiry into competitive conditions in the energy industry.
 
 
 26
 We would not ordinarily be inclined to supervise too closely the exercise by an agency of its investigatory powers. Cf. United States v. Morton Salt Co., supra, 338 U.S. at 641-43, 70 S.Ct. 357. But here there is no need to rely on any such posture of restraint. The Commission's opinion amply justifies the relationship between the information sought and the Commission's investigation of competitive conditions in the energy industry. The potential anti-competitive effects of interlocking directorates between banks and energy companies on "the capital-intensive energy sector" are obvious. We do not suggest that there are preferences in furnishing credit to some segments of the energy industry or that "interlocked energy companies used their position to deny or limit credit available to their competitors . . . or have access to confidential credit file data of competitors . . . or influence bank credit policies to encourage or to inhibit various alternative energy sources and industry structures." But the inquiry whether such practices exist certainly arises reasonably and logically out of the Commission's energy industry investigation, and it is therefore necessary for the Commission to obtain the answers.[9]
 
 
 27
 Appellants argue that "the only possible purpose" of the subpoenas is to uncover some wholly unspecified and inferential violation by the petroleum companies of section 5 of the Federal Trade Commission Act. They reach this conclusion, first, by concentrating only on the September 1974 resolution, see note 3 Supra, which referred only to petroleum companies and possible violations of section 8 of the Clayton Act, 15 U.S.C. § 19, or section 5 of the FTC Act, 15 U.S.C. § 45, and second, by asserting that interlocking relationships between banks and non-bank entities, including petroleum companies, do not violate section 8[10] and banks cannot violate section 5.[11] But appellants' outlook is too limited. We do not think that the Commission is confined to investigating only violations of existing law. Cf. 15 U.S.C. § 46(f). Congress directed it to study the energy industry, perhaps with a view to enacting new legislation, and the September resolution itself, upon which appellants focus, authorized an investigation into not only violations of law but also into "the extent and effects" of various interlocks.
 
 
 28
 Thus, even though our reasoning differs somewhat from that of the district court, we agree with its conclusion that the Commission had authority to issue the subpoenas.
 
 III
 
 29
 Appellants complain that even if the Commission is authorized to issue the subpoenas, they impose an undue burden of compliance. Appellants point to the fact that both district judges who reviewed these subpoenas commented on their breadth. Judge Hart of the United States District Court for the District of Columbia, in particular, chastised the Commission for some of the requests. However, we note that the negative comments were evoked prior to a series of modifications of the subpoenas, which significantly narrow the scope of the information sought.[12] In addition, Judge Lasker's June 1978 order, enforcing the subpoenas, incorporates a Statement of Intent from the Commission which sets forth a phased compliance schedule.[13] The Commission argues that once it has had an opportunity to review documents produced in the early stages, it may be able to narrow the scope of subsequent document requests.
 
 
 30
 Turning then to the merits of appellants' burdensomeness argument, we begin by noting that
 
 
 31
 the burden of showing that an agency subpoena is unreasonable remains with the respondent, . . . and where, as here, the agency inquiry is authorized by law and the materials sought are relevant to the inquiry, that burden is not easily met. (Citations omitted.)
 
 
 32
 SEC v. Brigadoon Scotch Distributing Co., 480 F.2d 1047, 1056 (2d Cir. 1973), cert. denied, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974). And we also agree with the Court of Appeals for the District of Columbia Circuit that
 
 
 33
 Broadness alone is not sufficient justification to refuse enforcement of a(n agency) subpoena. Thus courts have refused to modify investigative subpoenas unless compliance threatens to unduly disrupt or seriously hinder normal operations of a business. (Footnotes omitted.)
 
 
 34
 FTC v. Texaco, Inc., 180 U.S.App.D.C. 390, 555 F.2d 862, 882 (en banc), cert. denied, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977).
 
 
 35
 Applying these standards, we hold that appellants have failed to sustain their burden of showing the kind of disruption necessary to ground a finding of undue burden. The compliance cost, based on estimates submitted by some of appellants to the district court, which predate at least the last set of modifications included in the phased compliance schedule, simply do not appear to us to pose a threat to the normal operations of appellants' businesses considering their size. We thus agree with Judge Lasker's assessment that
 
 
 36
 having been charged (by Congress) with a massive undertaking, the FTC requires information and cooperation commensurate with its task the burden it imposes is not undue, it is intrinsic to the energy study.
 
 
 37
 441 F.Supp. at 242.
 
 
 38
 In his June 1978 order, Judge Lasker characterized the Commission's Statement of Intent as committing it
 
 
 39
 to the principle of phased compliance, with full cooperation with opposing counsel at all stages in working to eliminate any unnecessary burdens and, to the extent consistent with investigational objectives, the fullest possible reduction of the scale of production for later compliance phases based upon information supplied in earlier phases.
 
 
 40
 In a brief opinion accompanying that order, the judge concluded that the Statement of Intent
 
 
 41
 is such as to assure that a structure of phased compliance will be observed which will provide reasonable protection to the respondents in the circumstances.
 
 
 42
 Appellants argue that the district court "improperly abdicated" its judicial responsibility by failing to provide for continuing supervision of compliance with the subpoenas, as the magistrate recommended and as was allegedly done in Hunt Foods and Industries, Inc. v. FTC, 286 F.2d 803, 810-11 (9th Cir. 1960), cert. denied, 365 U.S. 877, 81 S.Ct. 1027, 6 L.Ed.2d 190 (1961). Whether the magistrate's proposed order went "considerably beyond" the order in Hunt Foods, as the Commission asserts, or not, Judge Lasker was certainly not required to accept it. We simply note our agreement with the judge's refusal to permit additional continuous piecemeal litigation over these subpoenas, which can have no other effect than to delay even further compliance with Congress' wishes. Federal investigative agencies are entitled, as Judge Lasker pointed out, to the presumption that they will proceed in good faith. See, E. g., SEC v. Savage, 513 F.2d 188, 189-90 (7th Cir. 1975).
 
 
 43
 Appellants also argue that if they must comply with the subpoenas, they are entitled to reimbursement of their costs of compliance from the government. While the district court has the power to require the government ultimately to pay the costs of compliance, United States v. Friedman, 532 F.2d 928, 936-38 (3d Cir. 1976); United States v. Davey,426 F.2d 842, 845 (2d Cir. 1970), it is a matter of discretion, cf. Fed.R.Civ.P. 45(b), 81(a)(3); United States v. Friedman, supra, 532 F.2d at 937. Generally, such costs will not be awarded unless they are found to be " not . . . reasonably incident to the conduct of (a respondent's) business." United States v. Davey, 543 F.2d 996, 1001 (2d Cir. 1976); United States v. Friedman, supra, 532 F.2d at 938. Cf. United States v. Farmers & Merchants Bank, 397 F.Supp. 418, 420-21 (C.D.Cal.1975). Here, it is obvious that the subpoenas are directly related to the conduct of appellants' businesses. They are not mere repositories of information performing a service for the government in complying with the subpoenas. Indeed, it is for that reason that the subpoenas could be justified under section 6 of the Federal Trade Commission Act, as discussed in Part II above. Thus, Judge Lasker committed no abuse of discretion in refusing to order reimbursement of the costs of compliance.
 
 
 44
 In conclusion, we affirm the judgment of the district court in all respects, differing solely as to the grounds on which the result should be placed.
 
 
 
 *
 Hon. Jon O. Newman, of the United States District Court for the District of Connecticut, sitting by designation
 
 
 [1]
 The Conference Report, in relevant part, stated:
 The conference agreement includes $1,000,000 for a study of the energy industry. This study shall be in conjunction with the study made heretofore which was limited to the petroleum industry and shall include a report to the Committee and to the Congress at the earliest practicable moment consistent with compiling an adequate study. As in the earlier petroleum study, the study should also include consideration of the effects of decisions by government departments and agencies, including environmental agencies, on the price and supply of energy. The study shall be conducted within the regular organizational structure of the Federal Trade Commission and under normal procedures.
 H.R.Rep.No.520, 93d Cong., 1st Sess. 24 (1973). Congress has since renewed both the Commission's authorization and the appropriation of funds.
 
 
 [2]
 The following is the text of the resolution concerning the nuclear energy industry:
 Nature and Scope of Investigation:
 To obtain information on all pertinent aspects of the structure, conduct and performance of the nuclear energy industry and on all relevant activities of each segment of that industry, including the production, sale and utilization of nuclear materials, the manufacture, sale, and utilization of nuclear power plant equipment, and other activities associated therewith, for the purpose of the development of a comprehensive study of the energy industry and report thereof to Congress pursuant to P.L. 93-135; it being understood that any such information received pursuant to compulsory process which pertains to possible violations of Section 5 of the Federal Trade Commission Act and/or Sections 7 and 8 of the Clayton Act may be utilized in conducting specific investigations thereof.
 The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation.
 Authority to conduct investigations: Sections 6, 9 and 10 of Federal Trade Commission Act, 15 U.S.C. 46, 49, 50; FTC Procedures and Rules of Practice, 16 CFR 1.1 et seq. and supplements thereto.
 By direction of the Commission.
 Charles A. Tobin
 Secretary
 Dated: April 16, 1974
 The two other resolutions on the coal and natural gas industries promulgated at the same time are virtually identical.
 
 
 [3]
 The following is the complete text of the September resolution:
 Nature and Scope of Investigation:
 To determine the extent and effects of direct and indirect interlocking directorates, and other interlocking personnel and business relationships among domestic petroleum companies and between such companies and financial institutions and to determine whether or not such interlocking relationships may be in violation of Section 8 of the Clayton Act or may result in unfair methods of competition or unfair acts or practices within the meaning of Section 5 of the Federal Trade Commission Act.
 The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation.
 Authority to Conduct Investigation:
 Sections 6, 9 and 10 of Federal Trade Commission Act, 15 U.S.C. 46, 49, 50; FTC Procedures and Rules of Practice 16 C.F.R. 1.1, et seq. and supplements thereto.
 By direction of the Commission.
 Charles A. Tobin
 Secretary
 Dated: September 12, 1974
 
 
 [4]
 The judge also dealt with a variety of other issues not relevant to this appeal
 
 
 [5]
 The stay expires with the filing of this opinion, and we now decline to continue it
 
 
 [6]
 Letter ruling of August 21, 1975 regarding the motion of appellant Chase Manhattan Corp. The Commission made similar rulings with regard to the other motions
 
 
 [7]
 The judge cited various authorities, e. g., FTC v. Cockrell, 431 F.Supp. 561 (D.D.C.1977), but appellants dispute their relevance
 
 
 [8]
 (T)his amendment (of which the proviso is a part) will give to the Federal Trade Commission major new statutory authority which is designed to enable the Commission to carry out its mandate to protect the public interest through prompt and aggressive enforcement of the laws it administers
 
 
 [119]
 Cong.Rec. 22979 (1973) (remarks of Sen. Jackson who introduced the amendment on the floor)
 
 
 [9]
 On this view, we need not deal with many other arguments raised on this appeal, e. g., whether bank holding companies, as distinguished from banks, are exempt from section 6(a); whether the Commission's investigation of appellants is authorized by sections 6(d) and 6(f) of the Act
 
 
 [10]
 For this proposition, appellants cite United States v. Crocker Nat'l Corp., 422 F.Supp. 686 (N.D.Cal.1976), appeal docketed, No. 76-3615 (9th Cir. Dec. 10, 1976)
 
 
 [11]
 For this proposition, appellants cite United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 336, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963)
 
 
 [12]
 For example, one request originally called for
 
 
 [4]
 Documents relating to the policies, procedures and criteria used by your bank during the subpoena period in the selection of persons to serve on its Board of Directors
 This was modified by adding to the end,
 if applicable to the selection of persons who were directors or officers of energy companies.
 
 
 [13]
 Besides the phased compliance schedule, the Statement of Intent contained further narrowing modifications. For example, the request for information regarding officers or employees of the banks who served or were asked to serve as directors of energy companies was limited to information concerning those bank employees of certain specified positions who had "authority to loan over $1,000,000 to any energy company."