PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-2834
_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Appellant

v.

KRONOS INCORPORATED

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(No. 2-09-mc-00079)
District Judge:  Honorable Arthur J. Schwab

_____

Argued June 26, 2012
_____

Before:  SLOVITER, CHAGARES, and JORDAN, <u>Circuit
Judges</u>

(Opinion filed: September 14, 2012)


Corbett Anderson, Esquire (Argued)
Equal Employment Opportunity Commission
5SW24K
131 M Street, N.E.
Washington, DC 20507

    Counsel for Appellant

R. Lawrence Ashe, Jr., Esquire (Argued)
Ashe, Rafuse & Hill
1355 Peachtree Street
Suite 500
Atlanta, GA 30309-0000

Terrence H. Murphy, Esquire
Littler Mendelson
625 Liberty Avenue
EQT Plaza, 26th Floor
Pittsburgh, PA 15222

  Counsel for Appellee

_____

OPINION

_____


CHAGARES, <u>Circuit</u> <u>Judge</u>.

  This is our second encounter with this case, which again requires us to consider the enforcement of an administrative subpoena issued by the Equal Employment Opportunity Commission ("EEOC") seeking to compel Kronos Incorporated ("Kronos"), a non-party to the underlying action, to disclose information about its employment tests. The EEOC issued the disputed subpoena as part of its investigation into an allegation that Kroger grocery store violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, <u>et</u> <u>seq.</u>, by failing to hire a disabled applicant after she took an employment test created by Kronos. We previously held that the EEOC was entitled to Kronos's data without the geographic, temporal, and topical restrictions originally imposed by the District Court except insofar as the EEOC sought discovery regarding racial discrimination. We also remanded for the District Court to conduct a good cause balancing test to determine if a confidentiality order was warranted.

  On remand, the District Court expanded the scope of its original order, but again placed certain limitations on the disclosure of information related to the Kronos tests.

2

Regarding Kronos's request for a confidentiality order, the court found there was good cause to enter a modified version of the order we previously reviewed. Finally, the District Court required Kronos and the EEOC to split evenly the costs of production.

Although the District Court's thoughtful handling of this case reflects its efforts to comply with our mandate and to strike a balance between the burden on a non-party and the EEOC's need for information, we must reverse and remand for the reasons that follow. We note, however, that we agree with much of the District Court's discussion regarding the need for a confidentiality order, and our remand on this issue is solely for the purpose of allowing the District Court to consider how the specific limitations it ordered are tied to Kronos's justifiable fears regarding the disclosure of proprietary information. Similarly, we are reversing the District Court's cost-sharing order not because we necessarily disagree with the result, but to allow the court to make an individualized determination of whether the costs of production under the newly expanded subpoena are outside the scope of what Kronos can reasonably expect to bear as the cost of doing business.

I.

The underlying facts of this case relate to a charge of discrimination Vicky Sandy filed with the EEOC on June 30, 2007. Sandy, who is hearing and speech impaired, applied to work as a cashier, bagger, and stocker at a Kroger grocery store in West Virginia. As part of the application process, Sandy took a Customer Service Assessment (the "Assessment") created by Kronos and received a low score of 40%. Kroger admitted it relied, at least in part, on the Assessment when it decided not to hire Sandy.

A.

During the course of its investigation into Kroger's hiring practices, on March 11, 2008, the EEOC issued a third-party administrative subpoena to Kronos. The subpoena initially sought documents solely related to Kroger, including any validity studies related to the Assessment. The EEOC

later expanded the scope of the subpoena to include the nationwide use of Kronos's assessment tests and the tests' impact on both minority and disabled applicants (like the District Court, we refer to the modified subpoena as "Subpoena 2"). Specifically, Subpoena 2 directed Kronos to:

> 1. Produce any and all documents and data constituting or related to validation studies or validation evidence pertaining to Unicru [a Kronos subsidiary] and/or Kronos assessment tests purchased by The Kroger Company, including but not limited to such studies or evidence as they relate to the use of the tests as personnel selection or screening instruments.
>
> 2. Produce the user's manual and instructions for the use of the Assessment Tests used by The Kroger Company[.]
>
> 3. Produce any and all documents and data, including but not limited to correspondence, notes, and data files, relating to the Kroger Company; its use of the Assessment Tests; results, ratings, or scores of individual test-takers; and any validation efforts made thereto.
>
> 4. Produce any and all documents discussing, analyzing or measuring potential adverse impact on individuals with disabilities and/or an individual[']s race.
>
> 5. Produce any and all documents related to any and all job analyses created or drafted by any person or entity relating to any and all positions at The Kroger Company.
>
> 6. Furnish a catalogue which includes each and every assessment offered by Unicru/Kronos. Additionally provide descriptions of each assessment.

EEOC v. Kronos Inc., 620 F.3d 287, 294 (3d Cir. 2010) ("Kronos I").

4

Kronos objected and filed a Petition to Revoke the Subpoena with the EEOC. Kronos claimed that the information sought by the EEOC included data that was irrelevant to Sandy's charge and that much of the information sought by the EEOC constituted valuable trade secrets that would be at risk of further disclosure if revealed. The EEOC denied the petition and, after Kronos failed to provide the requested information, filed a motion to enforce the subpoena in district court.

The District Court granted the motion in part, but limited the scope of the subpoena to documents related to Kroger's West Virginia operations and the positions of cashier, bagger, and stocker, from January 1, 2006 to May 31, 2007. The District Court also refused to allow discovery related to racial discrimination, since it was not a part of Sandy's charge. In sum, the District Court ordered Kronos to do the following:

1. Produce any user's manual and instructions for the use of the Assessment Tests provided to the Kroger Company.

2. Produce any and all documents and data, including but not limited to correspondence, notes, and data files, relating to The Kroger Company; The Kroger Company's use of the Assessment Tests; results, ratings, or scores of individual test-takers at The Kroger Company; and any validation efforts performed specific[ally] for and only for The Kroger Company.

3. Produce any and all documents discussing, analyzing or measuring potential adverse impact on individuals with disabilities, relating specifically to and only to the Kroger Company.

4. Produce any and all documents related to any and all job analyses created or drafted by Kronos relating to the bagger, stocker, and/or cashier/checker positions at The Kroger Company.

5. Furnish any catalogue provided to The Kroger Company.

6. Items 1 through 5 are limited to the time period of January 1, 2006 through May 31, 2007, in the state of West Virginia, for the positions of bagger, stocker, and/or cashier/checker.

Id. at 295. At Kronos's urging, the District Court also entered a confidentiality order confining the EEOC's use of discovery materials obtained from Kronos. The EEOC appealed the District Court's decision to us.

B.

In Kronos I, we reversed the District Court's geographic and temporal restrictions, as well as the restrictions related to job description, and affirmed the District Court's refusal to allow discovery into racial discrimination. We also vacated the confidentiality order and remanded so that the District Court could conduct the proper good cause balancing test, noting that the District Court should keep in mind the requirements of the Federal Records Disposal Act, 44 U.S.C. § 3314. Since the exact language of our opinion is important for determining whether the District Court complied with our mandate, a detailed discussion of that opinion is necessary.

Kronos I required us to consider the scope of the EEOC's investigatory power. As we explained, "The EEOC is empowered to investigate charges of discrimination to determine whether there is reasonable cause to believe that an employer has engaged in an unlawful employment practice." Id. at 296. This power is not without limits. Instead, "the EEOC is entitled to access only evidence 'relevant to the charge under investigation.'" Id. (quoting 42 U.S.C. § 2000e-8(a)). We went on to explain:

The relevance requirement is not particularly onerous. Courts have given broad construction to the term relevant and have traditionally allowed the EEOC access to any material that

6

might cast light on the allegations against the employer. Nonetheless, the EEOC's power of investigation is anchored to the charge of discrimination, and courts must be careful not to construe the charge and relevance requirements so broadly as to confer unconstrained investigative authority upon the EEOC. The relevance requirement is designed to cabin the EEOC's authority and prevent fishing expeditions. The EEOC bears the burden of demonstrating relevance.

Id. at 296-97 (citations and quotation marks omitted). We further explained that the concept of "relevance" may change during the course of an EEOC investigation, as the EEOC is permitted to pursue leads that arise during the course of an investigation even when that new evidence reveals "a broader picture of discrimination" than the original charge. Id. at 297 (quotation marks omitted).

In examining what constituted relevant evidence for Sandy's charge, we noted that the ADA prohibits employment tests of the type Kronos makes (and Kroger used in its hiring decisions) when such tests "'screen out or tend to screen out'" disabled people and the use of the test is not "'job-related for the position in question'" and "'consistent with business necessity.'" Id. at 296 (quoting 42 U.S.C. § 12112(b)(6)). Tests of this type may be impermissible under both disparate treatment and disparate impact theories. Id. Thus, evidence that would "cast light on" either a claim for disparate treatment or disparate impact caused by the use of the Kronos assessments would be relevant. Id.

The EEOC argued that all job types, geographic areas, and time periods were relevant, as well as all "Kronos Assessment instructions and manuals . . . (regardless of whether Kronos actually provided them to Kroger), [and] materials related to validation studies and potential adverse impact based on disability, even if such materials are not specific to Kroger's use of the test." Id. at 297. We agreed, holding that the District Court had employed "too restrictive a standard of relevance in limiting the information related to geography, time, and job position." Id. Moreover, we held,

7

"the District Court erred in limiting the EEOC's access to user's manuals and instructions, validation information, and materials pertaining to potential adverse impact on individuals with disabilities." Id. We determined that such information would aid the EEOC by providing "useful context and important comparative data" for its investigation of Kroger's use of the Assessment. Id. at 298 (quotation marks omitted).

We rejected Kronos's assertion that Subpoena 2 sought "information or materials related to assessment tests Kroger has never purchased and has never used," and instead held that the materials sought by the EEOC in Subpoena 2 were "not so broad as to render the relevance requirement a 'nullity.'" Id. at 299 (quoting EEOC v. Shell Oil, 466 U.S. 54, 69 (1984)). Specifically, we held that "[t]he District Court's decision denying the EEOC access to particular materials unless they relate only to Kroger was an improper use of its discretion" because any information in Kronos's possession regarding whether the Assessment had an adverse impact on disabled people, or the validity of the Assessment, "certainly might shed light on the charge of discrimination." Id. We further rejected Kronos's argument that Sandy's charge failed to allege disparate impact, thereby confirming that evidence related to any disparate impact of the Assessment on disabled people would be relevant to the EEOC's investigation. We summarized our holding on these issues as follows:

> [W]e will reverse the District Court's judgment insofar as it limited the scope of the EEOC's subpoena in terms of geography, time, and job description. We will also reverse to the extent that the District Court's order limits the EEOC's access to validation efforts conducted solely on behalf of Kroger, documents relating to potential adverse impact on disabled individuals to those relating specifically and only to Kroger, and user's manuals and instructions for the Assessment that were actually provided to Kroger.

Id. at 300.

Next, we considered the EEOC's request for documents related to any adverse impact that the Assessment had on the basis of race. We held that such a request was improper in light of the fact that Sandy's charge of discrimination related solely to disabilities. In so holding, we stated that "the inquiry into potential race discrimination is not a reasonable expansion of Sandy's charge" but instead constitutes "an impermissible fishing expedition." Id. at 301 (quotation marks omitted).

Finally, we considered the propriety of the confidentiality order entered by the District Court.[1] We began by recognizing that "[c]ourts have 'inherent equitable power' to grant orders of confidentiality upon a showing of good cause" by the party seeking the order. Id. at 301–02 (quoting Pansy v. Borough of Stroudsburg, 23 F.3d 772, 785–86 (3d Cir. 1994)). We remanded this matter to the District Court for it to conduct the "good cause balancing test" we established in Pansy, 23 F.3d at 788, which requires a court to consider certain factors before issuing a confidentiality order.

Although we did not weigh the Pansy factors ourselves, we did clarify the principles of law that the District Court should consider on remand in light of the fact that the information at stake here was requested by a government entity. Specifically, we stated that the good cause balancing test operates under "a strong presumption against entering an order of confidentiality whose scope would prevent disclosure of information that would otherwise be accessible under a relevant freedom of information law."[2] 620 F.3d at 302. We further cautioned that:

the District Court should be mindful of the

---

[1] It is important to note that the EEOC did not object to, or stipulated to, the following parts of the confidentiality order: (1) the prohibition on disclosure of "subpoenaed material to Sandy or her agents during the investigation"; and (2) the limitation on disclosure of subpoenaed material to anyone outside the EEOC, including expert witnesses, unless agreed upon in writing. Id. at 303 n.8.

[2] The relevant disclosure law here is the federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, et seq.

9

statutory scheme governing disposal of government records. The Federal Records Disposal Act ("FRDA") prohibits destruction of government records except according to its requirements. 44 U.S.C. § 3314. The FRDA defines "records" as "documentary materials . . . made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation . . . as evidence of the organization, function, policies, decisions, procedures, operations, or other activities of the Government." 44 U.S.C. § 3301. Courts must exercise caution when issuing confidentiality orders so as not to demand that the EEOC destroy government documents, including notes and memoranda, in conflict with the EEOC's duty to obey the requirements of the FRDA.

Id. at 303–04 (parenthetical omitted). With those caveats, we remanded this matter to the District Court.

C.

On remand, the District Court invited the parties to submit proposed orders that would comply with our mandate. The EEOC's proposal differed from both Subpoena 2 and the District Court's modified version thereof, seeking, inter alia, Kronos data related to all of its customers (not just Kroger) and personal data belonging to test-takers.[3] EEOC v. Kronos Inc., No. 09-mc-0079, 2011 WL 1085677 (W.D. Pa. Mar. 21, 2011) (hereinafter "Kronos II"). The District Court instead elected to enforce Subpoena 2 with new modifications that it believed conformed to our decision in Kronos I. Id. at *14.

_____

[3] The District Court found that the parties' first two proposed orders were too vague and asked both parties to modify their first proposed orders to be more specific regarding exactly what type of information was at issue. The EEOC asserts that its proposed order was sent pursuant to the District Court's instructions for specificity and did not represent a broadening of Subpoena 2. The District Court disagreed.

The EEOC sought reconsideration, which the District Court partially granted, altering the text of its order but retaining much of the language challenged by the EEOC. Specifically, as modified by its reconsideration order of May 3, 2011,[4] the District Court:

- Modified the request in ¶ 1 for "any and all documents and data constituting or related to validation studies or validation evidence pertaining to Unicru and/or Kronos assessment tests purchased by The Kroger Company, including but not limited to such studies or evidence as they relate to the use of the tests as personnel selection or screening instruments" by adding that such studies or evidence must be produced, "even if created or performed for other customer(s), if such studies or evidence were relied upon in creating or implementing the test for Kroger." This provision also stated that "[t]he names/identity of any other customer(s) should be deleted/redacted." The court further provided that "[s]aid document production is limited to information relating to disabilities, persons with disabilities, or adverse impact upon persons with disabilities."

- Altered ¶ 3, which requires Kronos to produce "any and all documents (if any) related to the Kroger Company, including but not limited to correspondence, notes and data files, relating to The Kroger Company; its use of Assessment Tests; results, ratings, or scores of individual test-takers; and any validation efforts made thereto," by

---

[4] The language added following reconsideration of the District Court's original order enforcing the subpoena is underlined.

11

adding the disability-related limitation in ¶ 1.

- Added ¶ 6, which forbids the EEOC from disclosing documents or information produced under the Subpoena — all of which it termed "Confidential Information"[5] — to anyone else, including Sandy, and that any EEOC person who saw the information must agree in writing to the terms of the Order. The District Court also limited the use of the "Confidential Information" to the Sandy Charge. Finally, the Court placed the burden on the EEOC to file a motion to challenge whether a document should be marked confidential by adding the following: "<u>Once document production occurs pursuant to this Order of Court, should the EEOC believe that good cause exists to lift the 'Confidential Information' designation for any particular document(s), the EEOC may file a motion in that regard, and the Court will conduct the proper inquiry</u>."

- Added ¶ 8, which states: "If any party or third party seeks to obtain Confidential Information from the EEOC under either the [Freedom of Information Act ("FOIA")] or Section 83 of the EEOC Compliance Manual while the EEOC's investigation of the Sandy Charge is open, then the EEOC will notify Kronos . . . as soon as is practicable and will assert that the Confidential Information is exempt from disclosure under FOIA, based on the pending investigation, pursuant to 29 C.F.R. § 1610.10 and/or

---

[5] The court defined "confidential information" as "any documents or information derived from documents produced pursuant to" its order enforcing the subpoena.

12

the EEOC's own rules or procedures. If a FOIA request or any other request for the contents of the file with respect to the Sandy Charge or Confidential Information is received after [the] EEOC has closed the Sandy Charge, the EEOC agrees to notify Kronos in the same manner as described and as soon as is practicable, but in no event more than five (5) business days after the request is received, and the EEOC agrees to give Kronos an opportunity to object to disclosure of the Confidential Information to the requesting party. Kronos shall have five (5) business days after receiving such notice to object to disclosure. If Kronos objects, [the] EEOC agrees not to disclose the Confidential Information to the requesting party or parties. [The] EEOC further agrees that, if a party sues [the] EEOC under FOIA to obtain a copy of a charge file which includes Confidential Information, [the] EEOC will not object to Kronos intervening to pursue its objections and confidentiality concerns."

- Added ¶ 9, which provides, "No use shall be made of personal information regarding any Kroger employee, applicant, and/or test taker without prior permission of this Court."

See Appendix ("App.") 43–49.[6]

---

[6] The District Court also added ¶ 7 to set forth a procedure for disclosing Confidential Information to outside experts and ¶¶ 10 and 11 to state that neither party waived its objections regarding the confidentiality issues and that the court would retain jurisdiction to enforce its order. The EEOC does not object to these provisions.

In crafting these provisions, the District Court performed the Pansy balancing analysis that we required in Kronos I, finding that the privacy interests of job applicants, the need to protect Kronos's trade secrets, and the fact that the information was not "critical to public health or safety" all counseled in favor of granting the confidentiality order. Kronos II, 2011 WL 1085677, at *15. On the other side of the scale was the fact that the information was sought for a legitimate purpose, information-sharing would promote "efficiency and fairness," and the public interest. Id. The District Court ultimately found that these factors weighed in favor of granting a limited confidentiality order (which, unlike the previous order, allowed the entry of data into a centralized database and did not require the destruction of documents within ten days). Id. at *16.

The District Court also entered a cost-sharing order, finding that it was proper to require the EEOC to reimburse a subpoena recipient for the cost of production under our decision in United States v. Friedman, 532 F.2d 928 (3d Cir. 1976). Kronos estimated that the cost of compliance with the modified subpoena would be $75,000, although it seems to have provided no evidence to support this figure.[7] App. 50. Following briefing by both parties, the District Court decided that requiring each party to pay 50% of the costs would properly "strike a balance between the EEOC's need for the information, and the financial burden on Kronos." Id. 53. The EEOC contends this was an error both on the merits and because Kronos waived this issue by not raising it to the District Court in the first proceedings.

---

[7] The only evidence in the record relating to costs was the affidavit of Annette Kuhn, Kronos's Director of Workforce Science Services, and the exhibits appended thereto. Kuhn reviewed the original, broader version of Subpoena 2, and averred that Kronos had more than 11 million responsive documents which would cost somewhere between $656,184 and $1,161,119 to produce. App. 87, 91. The Kuhn affidavit does break down costs on an hourly basis and would have been available to the District Court, but because the District Court does not refer to these materials in its opinion, it is unclear whether it considered them when adopting Kronos's $75,000 figure.

## II.

The District Court had jurisdiction under 29 U.S.C. § 161(2) and 28 U.S.C. §§ 1331 and 1345. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's decision to grant or deny a subpoena enforcement application for an abuse of discretion. Kronos I, 620 F.3d at 295. It is an abuse of discretion for a district court to base its decision on "a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." Id. at 295–96 (quotation marks omitted). "We also employ an abuse of discretion standard when reviewing the grant of a confidentiality order." Id. at 295.

## III.

The EEOC first challenges the District Court's revisions of the subpoena on the basis that they conflict with our mandate in Kronos I and that they are otherwise inappropriate on the merits.

"It is axiomatic that on remand for further proceedings after [a] decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal." Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 949 (3d Cir. 1985). "A trial court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." Id. When an appellate court does not issue specific instructions on how to proceed, "the question as to what further proceedings can be had consistent with the opinion of the appellate court must be determined from the nature of the case and the pertinent statutory provisions." Id. at 950. During the course of such proceedings, the district court "may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision." Id.

As we recently explained in United States v. Kennedy, 682 F.3d 244 (3d Cir. 2012), the requirement that a district court comply in full with our mandate has several important purposes:

15

It preserves the proper allocation of authority within the tiered federal court structure set up by Congress and the Constitution. It promotes predictability and finality by notifying parties of the matters that remain open on remand and committing the rest to final resolution. And it safeguards stability in the administration of justice, for the orderly functioning of the judiciary would no doubt crumble if trial judges were free to disregard appellate rulings. See Litman v. Mass. Mut. Life Ins. Co., 825 F.2d 1506, 1511-12 (11th Cir. 1987) ("Post mandate maneuvering in the district courts would undermine the authority of appellate courts and create a great deal of uncertainty in the judicial process."); cf. Hutto v. Davis, 454 U.S. 370, 375 (1982) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.").

Id. at 253 (some citations omitted).

We must therefore "examine whether the District Court adhered to the mandate in our first opinion or whether it ventured beyond its authority." Id.

A.

The EEOC argues that the District Court erred by modifying its request for "any and all documents and data constituting or related to validation studies or validation evidence pertaining to Unicru and/or Kronos assessment tests purchased by The Kroger Company, including but not limited to such studies or evidence as they relate to the use of the tests as personnel selection or screening instruments," by adding that such studies or evidence must be produced, even if done for another company, only if they were "relied upon in creating or implementing the test for Kroger." App. 48.

As we noted in Kronos I, to enforce an administrative subpoena, the EEOC must demonstrate: "(1) its investigation

16

has a legitimate purpose, (2) the inquiry is relevant to that purpose, (3) the agency does not already possess the information requested, (4) the agency has complied with relevant administrative requirements, and (5) the demand is not unreasonably broad or burdensome." 620 F.3d at 296 n.4 (quotation marks omitted). Here, as before, it is the second requirement that is at issue.

Because the concept of "relevance" in the context of an administrative subpoena enforcement action was thoroughly explained in Kronos I, a detailed discussion is unnecessary. It suffices to reiterate that this requirement is "broad" and not "particularly onerous" but must nonetheless be "anchored to the charge of discrimination." Kronos I, 620 F.3d at 296–97. It is also worth noting that the first decision to remand this matter was based on our opinion that the District Court "applied too restrictive a standard of relevance" in creating its original geographic, temporal, and topical limitations. Id. at 297. Specifically, we held that "[t]he District Court's decision denying the EEOC access to particular materials unless they relate only to Kroger was an improper use of its discretion" because documents unrelated to Kroger could nonetheless "shed light on the charge of discrimination." Id. at 299 (emphasis added).

The District Court's decision to restrict the scope of the subpoena to validation studies or evidence that Kronos "relied upon" in crafting the assessment used by Kroger impermissibly contradicts our holding in Kronos I that such documents must be produced by Kronos even if they are not directly linked to Kroger. In Kronos I, we considered (and rejected) the District Court's decision to limit "production of 'documents discussing, analyzing, or measuring potential adverse impact on individuals with disabilities' to those 'relating specifically to and only to The Kroger Company.'" Id. We explained that such documents are relevant even if not directly connected to Kroger because they could reveal that the assessment had an adverse impact on disabled applicants or they could "assist the EEOC in evaluating whether Kroger's use of the test constituted an unlawful employment action." Id. The District Court nonetheless introduced the "relied upon" language on remand, which is

17

only marginally broader than the "relating specifically to" language we rejected.[8]

To prove a violation of 42 U.S.C. § 12112(b)(6), the EEOC is required to show that the employment test at issue (1) "screen[s] out or tend[s] to screen out" disabled applicants; (2) is unrelated to the position sought by the applicant; and (3) is not "consistent with business necessity." These statutory requirements place the nature and efficacy of the test (or tests)[9] at issue, at least insofar as the test was purchased by Kroger — a proper limitation already included in Subpoena 2. It was therefore unnecessary to include the "relied upon" clause, since the question of whether these tests were given in violation of the ADA forces courts to look objectively at how the tests work.

Any limitation on the production of validity studies that requires such studies to relate to Kroger in any way impermissibly excludes relevant evidence and violates our mandate in Kronos I. We will therefore remand with instructions to the District Court to remove the "relied upon" language from its order enforcing the subpoena.

B.

We now turn to the District Court's alteration of ¶¶ 1 and 3 by adding language intended to limit the applicability of the subpoena to disability-related issues. Paragraph 1

---

[8] Arguably, this language is actually narrower because it limits the way in which the information must relate to Kroger. Conversely, the removal of "specifically" and the addition of the proviso that studies done for other companies must be produced if they were "relied upon" could be viewed as making the newer language slightly more expansive. Whether the District Court's most recent modification is slightly narrower or broader, however, is immaterial because the language is not sufficiently different to satisfy the requirements of our mandate.

[9] It is unclear from the record whether Kroger purchased multiple tests from Kronos, but if discovery reveals that it did, then information surrounding each of the purchased tests would be relevant.

sought validation studies and evidence regarding the Kronos assessments, and ¶ 3 sought the production of "any and all documents (if any) related to the Kroger Company, including but not limited to correspondence, notes and data files, relating to the Kroger Company; its use of Assessment Tests; results, ratings, or scores of individual test-takers; and any validation efforts made thereto." App. 43–44. In both instances, the District Court added the following language: "[s]aid document production is limited to information relating to disabilities, persons with disabilities, or adverse impact upon persons with disabilities." Id. at 44.

Regarding the validation studies sought in ¶ 1, it is again worth looking at our statement in Kronos I that "the District Court erred in limiting the EEOC's access to user's manuals and instructions, validation information, and materials pertaining to potential adverse impact on individuals with disabilities." 620 F.3d at 297. There are two possible interpretations of this language: either the "pertaining to . . . disabilities" clause modifies only "materials," or the clause also modifies "user's manuals and instructions" and "validation information." We believe it is relatively clear that we intended the former meaning, as it would be illogical to require that the "user's manuals and instructions" pertain to disabilities. Thus, there is no basis in our prior opinion for limiting "validation information" to that which relates to disabilities; our opinion only limits such information if it pertains to the wholly unrelated field of racial discrimination.

Again, it is insufficient for the EEOC to show simply that an employment test screens out disabled applicants. See 42 U.S.C. § 12112(b)(6). The EEOC must also prove that the test does not relate to the position at issue and is not "consistent with business necessity." Id. It is thus a proper inquiry for the EEOC to seek information about how these tests work, including information about the types of characteristics they screen out and how those characteristics relate to the applicant's ability to fulfill his or her duties for the prospective position. The EEOC must also consider how these tests work at screening out those unable to perform a certain job and "screening in" those who can. The type of information sought in ¶ 1 is relevant to this inquiry and

19

should be provided in order for the EEOC to effectively pursue its investigation.

Kronos responds that the EEOC's Uniform Guidelines on Employee Selection Procedure, which sets forth standards for test validation when an adverse impact on a protected class has been shown, specifically does not apply to disabled persons. See 29 C.F.R. § 1607.2(D). For this reason, Kronos asserts, there is no requirement that a company administering an employment test conduct validation studies related to an adverse impact on disabled persons. We agree that no such requirement exists, but this argument misses the point — the question is not whether Kronos or Kroger was required to conduct a validation study targeted towards a specific group, but whether any validation studies (targeted or otherwise) that Kronos has already conducted are relevant to Sandy's charge of discrimination. Moreover, it appears that the validity studies in Kronos's possession are of general applicability and were not specifically targeted to race and gender. At oral argument, counsel for Kronos conceded that "it varies, but generally speaking validity studies to show whether or not a test is job-related are not directed specifically at a race or a gender or a national origin." Oral Arg. at 24:41–24:59. We then asked counsel whether these studies focused on the people taking the test or the test itself, to which counsel responded that validation studies "relate to whether or not the test predicts performance on a particular job" and admitted that "to the extent that [the EEOC] wish[es] to see if the test predicts job performance generally, [the validation study] is relevant." Id. at 33:56–34:43.

We also disagree with the inclusion of the disability limitation in ¶ 3. All of the information in ¶ 3 is already sufficiently limited because it relates to The Kroger Company and is, again, generally necessary to help the EEOC understand whether Kroger's use of the assessment was permissible and to prove the elements of § 12112(b)(6). There is no reason why communication between Kroger and Kronos regarding the Assessment (or any other tests Kroger purchased) should be excluded simply because it does not directly relate to disabilities.

We note that there is the potential for some of the information sought in both ¶¶ 1 and 3 to include documents related to race. In our view, this is not inherently problematic so long as the requests do not specifically target documents related to race.[10] If the documents produced by Kronos in response to the subpoena reveal that there was a racially related impact on hiring, then, as we noted in Kronos I, the EEOC need not ignore this new evidence. 620 F.3d at 301. In such a case, the EEOC could file a commissioner's charge alleging racial discrimination pursuant to its power under 42 U.S.C. §§ 2000e-5(b) and 2000e-6.

For these reasons, on remand we instruct the District Court to remove the language in ¶¶ 1 and 3 that limits the evidence sought in those paragraphs to disability-related issues.

IV.

We now consider the confidentiality order entered by the District Court. As noted, in Kronos I we reversed the District Court's grant of this order based on the failure to consider the "good cause balancing test" we established in Pansy, which encompasses the following, non-exhaustive list of factors:

> 1) whether disclosure will violate any privacy interests;
>
> 2) whether the information is being sought for a legitimate purpose or an improper purpose;

---

[10] In recognition of the District Court's valid concern that the evidence sought in the subpoena could allow the EEOC to venture impermissibly into the field of racial discrimination, the EEOC stipulated that it had no objection to the District Court's allowing Kronos "to redact the information that relates solely, and refers specifically and only to, race, and to redact the names of Kronos's other clients." Oral Arg. 44:14–38. The District Court may wish to consider adding the EEOC's proposed limiting language to allow for the redaction of client names and to preclude the production of documents that relate solely to race.

3) whether disclosure of the information will cause a party embarrassment;

4) whether confidentiality is being sought over information important to public health and safety;

5) whether the sharing of information among litigants will promote fairness and efficiency;

6) whether a party benefitting from the order of confidentiality is a public entity or official; and

7) whether the case involves issues important to the public.

620 F.3d at 302.

On remand, the District Court properly set forth the Pansy factors and explained how each factor should be weighed in this case. The court found that the privacy interests of job applicants, the need to protect Kronos's trade secrets, and the fact that the information was not "critical to public health or safety" all counseled in favor of granting the confidentiality order. Kronos II, 2011 WL 1085677, at *15. The "most compelling factor" in the District Court's view was "that the privacy interests of Kronos would be protected and their trade secrets and/or proprietary information would be kept 'confidential'" if an order was issued. Id. This was important, the court said, because if Kronos's assessment materials were to be publicly disclosed, "the potential harm and damage to the business of non-party Kronos would be significant." Id.

The District Court then considered the factors that weighed against granting a confidentiality order. On this side of the scale was the fact that the information was sought for a legitimate purpose, that information-sharing would promote "efficiency and fairness," and the public interest. Id. The District Court ultimately found that these factors weighed in favor of granting a limited confidentiality order, stating:

[A]fter further consideration, the Court has

22

revised the prior Confidentiality Order hopefully consistent with the direction of the Court of Appeals and has substantially limited the terms of the Confidentiality Order to address the concerns of the parties. Notably, the Court has removed from its Order the provisions that the confidential material not be entered into a centralized database, and that the notes or memoranda made by the EEOC shall be destroyed within ten (10) days after a notice of right to sue is issued by EEOC. The Court in general has used the language suggested by the EEOC with additional safeguards suggested by Respondent in light of the trade secret information of Respondent and personal data of the test takers.

Id. at *16 (citation omitted).

The District Court effectuated its confidentiality order by adding five new paragraphs to its general order of March 21, 2011, three of which are disputed here (¶¶ 6, 8, and 9). Paragraph 6 contained the provision that the EEOC could not disclose documents or information produced under the Subpoena — all of which it termed "Confidential Information" — to anyone else, including Sandy,[11] and that any EEOC employee who saw the information must agree in writing to the terms of the Order. This paragraph also limited the use of the Confidential Information to the Sandy charge. To the extent that the EEOC wished to challenge whether a document should be designated confidential, the court required it to file a motion.

Paragraph 8 reflected Kronos's concerns about whether its information would be disclosed via FOIA requests to the EEOC. The provision states that the EEOC must assert an exemption and notify Kronos if a FOIA request is received during the pendency of the Sandy charge. If such a request is

---

[11] The EEOC does not dispute that this information should be withheld from Sandy and has stipulated that it will not "make any disclosure to Sandy or her agents during the investigation." EEOC Br. 38.

23

received after the charge has been closed, the EEOC is prohibited from disclosing the information should Kronos file a timely objection. Further, ¶ 8 provides that the EEOC cannot object to Kronos's intervention in any suit in which a party seeks to obtain Confidential Information from the EEOC.

Paragraph 9 states, "No use shall be made of personal information regarding any Kroger employee, applicant, and/or test taker without prior permission of this Court." App. 45. This paragraph does not explain what constitutes "personal information."

A.

The EEOC first argues that no confidentiality order is warranted because the information it seeks is protected from disclosure by Title VII and the ADA, both of which prohibit any EEOC employee from making charges public or revealing any information acquired pursuant to an investigation before a formal proceeding is instituted. 42 U.S.C. §§ 2000e-8(e), 12117(a). For example, § 2000e-8(e) provides, "It shall be unlawful for any officer or employee of the [EEOC] to make public in any manner whatever any information obtained by the [EEOC] . . . prior to the institution of any proceeding . . . involving such information." The EEOC also points out that the Trade Secrets Act, 18 U.S.C. § 1905, forbids the EEOC and its employees from disclosing trade secrets or other confidential commercial information. Additionally, the EEOC asserts that the Privacy Act of 1974 protects EEOC files from disclosure both during and after an investigation. See 5 U.S.C. §§ 552(b), 552a(b); 29 C.F.R. § 1610.19(a). Finally, although the EEOC may be empowered to make certain disclosures to the parties to a charge during the course of an investigation, it has stipulated that it would not disclose any subpoenaed material to Sandy or her agents during the course of its investigation. EEOC Br. 35–36.

Kronos responds by emphasizing the harm that any disclosure — whether accidental or intentional — would cause to its business. Any breach in confidentiality of this material would render the tests useless for Kronos's clients

and could advantage a competing test developer. Kronos would then be forced to devote a considerable amount of time and resources to developing new assessments, which could harm its ability to operate a profitable business. Kronos also expresses concern about the release of individual test takers' private information and its contractual obligations to maintain confidentiality in its customer communications.

In light of Kronos's valid fear regarding the harm it could suffer from disclosure of the subpoenaed information, some form of a confidentiality order may indeed be warranted in this case. Confidentiality orders have been approved in other cases where district courts ordered the disclosure of testing materials because the courts recognized the importance of maintaining the confidentiality of such documents.[12] See, e.g., EEOC v. Aon Consulting, Inc., 149 F. Supp. 2d 601, 609 (S.D. Ind. 2001) (holding a confidentiality order was warranted because "the EEOC has not shown that existing statutory and regulatory procedures and protections offer sufficient protection to require disclosure"); EEOC v. C&P Tel. Co., 813 F. Supp. 874, 876 (D.D.C. 1993) (finding that the "extremely strong interest in protecting the subpoenaed information," which related to employment tests, justified the entry of a confidentiality order). The EEOC argues that the lack of necessity due to the existing statutory protections renders a confidentiality order improper, but we see no abuse of discretion in the District Court's conclusion that additional protection was needed

---

[12] The EEOC urges us to overturn the confidentiality order based on University of Pennsylvania v. EEOC, 493 U.S. 182 (1990), which held that a university does not enjoy a special privilege "against disclosure of peer review materials" related to discrimination charges. Id. at 184. As Kronos correctly points out, this case and the other cases cited by EEOC are not on point. Kronos Br. 45–46 & n.25. While the Court mentioned the statutory non-disclosure provisions in the EEOC laws and suggested that the privilege would impede the effective administration of the statute, it did not in any way suggest that a district court must refuse to grant additional confidentiality protections where otherwise warranted due to the non-disclosure laws governing the EEOC.

because the business interests of Kronos — a third party to this litigation — would be greatly harmed if its proprietary data was disclosed. Moreover, since the EEOC has asserted that various statutes otherwise protect this data from disclosure, it is difficult to see how the EEOC's interests, or the public interest in disclosure, is affected by a confidentiality order. While the burden falls on Kronos to show the need for an order, the EEOC's legitimate purpose and interest in information-sharing cannot outweigh the tremendous harm to Kronos that could result from the disclosure of Kronos's proprietary information. The District Court thus did not abuse its discretion in entering a confidentiality order.

## B.

While some form of a confidentiality order may be warranted, however, we must still consider whether the scope of the confidentiality provisions issued by the District Court were proper. We first examine the EEOC's objection to ¶ 8.

This paragraph essentially requires the EEOC to provide notice of any FOIA requests to Kronos, refuse to disclose information in a FOIA request if Kronos objects, and allow Kronos to intervene in any suit in which a party seeks to obtain confidential information from the EEOC. The EEOC argues that the requirements set forth in ¶ 8 conflict with its FOIA policies in four material ways: (1) the EEOC must notify Kronos of any FOIA request made during the pendency of the Sandy charge, rather than remaining silent and routinely denying all such requests pursuant to 29 C.F.R. § 1610.19(g); (2) the EEOC must notify Kronos of a FOIA request made after closure of the Sandy charge within five business days, rather than having no time constraint for providing such notice; (3) the EEOC must not disclose the Confidential Information if Kronos objects to such disclosure, whereas its own policies require the EEOC to make an independent determination of whether Kronos raised a valid objection to disclosure pursuant to 29 C.F.R. § 1610.19(e)(1), and any disagreement with the EEOC's decision to disclose would require the objector to seek an injunction to prevent disclosure; and (4) the EEOC must not object to Kronos's

26

intervention if sued by a party under FOIA, whereas the EEOC would normally be able to object.

As the EEOC points out, entry of ¶ 8 appears to reflect a presumption that all of the so-called "Confidential Information" produced by Kronos constitutes trade secrets or commercial information that is entitled to remain confidential. It is important to note that the District Court defined "Confidential Information" as "any documents or information derived from documents produced pursuant to" its order enforcing the subpoena. App. 48. This broad definition raises the possibility that the confidentiality order would encompass data in which neither Kronos, nor its customers and their respective job applicants, have any privacy interest — for example, data that Kronos has already publicly disclosed. Given that neither we nor the District Court are privy to the information Kronos will disclose under the subpoena, we have no basis for concluding that all the subpoenaed information is protected.

This is significant in light of our precedent regarding the purposes of FOIA and how requests for information should operate. Congress enacted FOIA in 1966 to promote greater public disclosure of documents in the Government's possession. OSHA Data / CIH, Inc. v. U.S. Dep't of Labor, 220 F.3d 153, 160 (3d Cir. 2000). Because Congress sought to promulgate "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language," an agency bears the burden of proving that one of the nine statutory exceptions applies. Id. (quotation marks omitted). A document may not be exempted from disclosure under FOIA simply because some of its contents may be exempted; instead, "[w]e would have to be convinced that every 'reasonably segregable portion' of each document contains protected information." AT&T v. FCC, 582 F.3d 490, 499 n.8 (3d Cir. 2009) (quoting 5 U.S.C. § 552(b)), rev'd on other grounds, 131 S. Ct. 1177 (2011).

Allowing Kronos to assert unilaterally that any information it discloses to the EEOC is automatically exempt under FOIA precludes EEOC officials from performing the analysis required by FOIA after a request for information is made. It is likely that much of the data disclosed by Kronos

27

will indeed be exempt under 5 U.S.C. § 552(b)(4), which allows nondisclosure of "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Nonetheless, the District Court erred by impeding the EEOC's ability to do its required analysis when faced with a FOIA request.

On remand, we will instruct the District Court to remove ¶ 8 of its March 21, 2011 order. However, we do not wish to foreclose the possibility that the District Court may exercise its discretion to redraft this provision to tailor it more narrowly. If the District Court elects to do so, the court shall specifically consider how the Pansy factors relate to these specific limitations on disclosure. We also ask that the District Court limit any such provision to information that must remain confidential to protect Kronos's business interests, such as trade secrets, commercial information, and financial data.

C.

The EEOC also argues the District Court erred by limiting its use of the Kronos data to the Sandy charge (¶ 6) and precluding the EEOC from using "personal information regarding any Kroger employee, applicant, and/or test taker without prior permission of [the] Court" (¶ 9). App. 45. According to the EEOC, the court's power to enforce a subpoena and to enter an appropriate confidentiality order "does not mean the court may require the [EEOC] to pre-clear how it uses the subpoenaed information" during the course of its investigation. EEOC Br. 48.

In support of its argument that it has authority to use subpoenaed information for multiple charges involving employers other than Kroger, the EEOC cites EEOC v. Associated Dry Goods, 449 U.S. 590 (1981). There, the Supreme Court held that the EEOC may place relevant information in multiple charge files involving the same employer. Although it recognizes this distinction, the EEOC argues that we should extend this rule to situations where, as here, the EEOC might potentially use Kronos's information in multiple charge files against multiple employers. Kronos responds that the EEOC failed to explain how its

28

investigation would be affected by this restriction and that there is no legal basis for the EEOC's assertion that it should have unlimited right to use the subpoenaed information in its investigations of other charges.

Although Associated Dry Goods does not provide a resolution to this dispute, our opinion in Kronos I foreshadows why the District Court's limitations regarding the use of the data are problematic. We explained there that "[o]nce the EEOC begins an investigation, it is not required to ignore facts that support additional claims of discrimination if it uncovers such evidence during the course of a reasonable investigation of the charge." 620 F.3d at 297. The District Court's order effectively impedes the EEOC's ability to pursue any such leads by denying the EEOC the ability to use the data provided by Kronos. This language may have been included due to the District Court's concern that the EEOC would use its subpoena as a "fishing expedition" into other employers' use of employment tests and into other forms of discrimination by both Kroger and other employers in violation of our opinion in Kronos I. Nonetheless, once we have decided the documents sought are relevant to the charge of discrimination, any other improper behavior discovered during the course of the EEOC's investigation may be pursued. Accordingly, the District Court's limitations on the EEOC's use of subpoenaed information is improper. We will remand with instructions to the District Court to strike the language contained in ¶¶ 6 and 9.

V.

The EEOC also asserts the District Court erred by requiring it to reimburse Kronos for half of the cost of producing the subpoenaed information.

A.

The EEOC first argues the District Court should not have considered Kronos's request for the EEOC to cover the costs of compliance with the subpoena because Kronos waived this argument by failing to raise the claim during the first appeal. Specifically, the EEOC argues that the cost-shifting issue "obviously overlap[s] considerably" with the

"undue burden" standard that is part of the fifth element in the test to enforce an administrative subpoena. EEOC Br. 53. Kronos did not raise an undue burden argument during the initial proceedings before the District Court, which, according to the EEOC, is tantamount to a failure to object to paying the full cost of compliance with the subpoena. Conversely, Kronos contends that its initial objection to the subpoena raised the issue of cost by arguing that "'[c]ompliance . . . would require Kronos to expend very substantial resources, time, and money.'" Kronos Br. 53 (quoting App. 178). It then "suspended" the issue after the District Court significantly narrowed the scope of the subpoena in its order of June 1, 2009. Id. The issue did not resurface until after our decision in Kronos I — which expanded the scope of discoverable material and therefore increased the cost of compliance with the subpoena — at which time Kronos promptly raised it. Kronos also correctly states that, as the appellees in Kronos I, "they were not required to raise all possible alternative grounds for affirmance to avoid waiving those grounds." Eichorn v. AT&T Corp., 484 F.3d 644, 657–58 (3d Cir. 2007).

"It is well established that arguments not raised before the District Court are waived on appeal." DIRECTV Inc. v. Seijas, 508 F.3d 123, 125 n.1 (3d Cir. 2007). However, when a case is remanded, a district court "may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision." Bankers Trust, 761 F.2d at 950. We have thus explained that a district court "is thereby free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not settled by the decision." Id.

Our opinion in Kronos I did not discuss who should bear the costs of compliance with the EEOC's subpoena, leaving the District Court free to consider the issue. Moreover, Kronos's position on remand was significantly altered by our opinion in Kronos I because our opinion broadened the scope of the document production and thus likely increased Kronos's cost of production. Kronos was entitled to renew its objection to the new, higher cost of preparing discoverable materials. We therefore hold that Kronos did not waive this issue.

B.

The EEOC also objects to the merits of the District Court's decision that the costs of compliance should be split evenly between it and Kronos.

The District Court based its decision on United States v. Friedman, 532 F.2d 928, 936 (3d Cir. 1976), which involved the Government's attempt to enforce summonses against several third-party banks and an accountant in the context of a tax liability investigation. We recognized that no statutory authority exists to compel shifting the costs of compliance with an administrative subpoena. Even so, we held that courts have the power to award costs when deciding to enforce a subpoena. Id. We went on to consider Federal Rule of Civil Procedure 45, which in its current iteration may require compensation for non-parties subject to civil subpoenas. We noted that Rule 45 does not apply to administrative subpoenas, but nonetheless found the text of the rule, when coupled with Congress's decision to entrust courts with the enforcement of administrative subpoenas, to be a useful indicator of "a broad congressional judgment with respect to fairness in subpoena enforcement proceedings." Friedman, 532 F.2d at 937. We further required that courts engage in an "individualized consideration rather than generalization" in determining how to award costs, holding that it was improper for the district court there to set a general rule requiring reimbursement for all of the banks involved in the case instead of considering each bank separately. Id. Such an analysis was necessary, we held, in order to decide whether "the cost involved in complying with the summons in question exceed[ed] that which the respondent may reasonably be expected to bear as a cost of doing business." Id. at 938.[13]

---

[13] Friedman is the leading authority in this Circuit. Although the EEOC cites EEOC v. Maryland Cup Corp., 785 F.2d 471 (4th Cir. 1986), for the proposition that there is no statutory right to reimbursement, that case involved a subpoena issued to a party and, in any event, cannot supersede the law of this Court.

31

Following briefing by both parties, the District Court ordered that requiring each party to pay 50% of the costs would properly "strike a balance between the EEOC's need for the information, and the financial burden on Kronos." App. 53. The court appeared to be particularly concerned about imposing the full cost of such a large production on a non-party. App. 52. It is unclear from the record exactly what evidence was before the court to prove that the costs of compliance would total $75,000, as the court mentioned only the existence of a one-page joint status report. The sole piece of evidence in the record related to costs is the Kuhn affidavit, which was prepared in response to the more expansive Subpoena 2, and thus estimated the cost of compliance to fall between $656,184 and $1,161,119.[14] App. 87, 91.

We do not dispute that a cost-sharing order is within the District Court's discretion, and we recognize that the estimate of $75,000 will likely increase when this case returns to the District Court. Because the District Court will therefore again be tasked with determining how to allocate costs here, we note a few principles that should apply under such circumstances.

As we stated in Friedman, the primary consideration in fairly allocating the cost of compliance with an administrative subpoena is whether the cost of compliance with the subpoena "exceed[ed] that which the respondent may reasonably be expected to bear as a cost of doing business." 532 F.2d at 938. Such an inquiry requires at least some evidence to support a party's assertion about what the actual costs of compliance will be. Id. at 937 (noting that a party who seeks reimbursement should be "required to produce evidence of the expense likely to be incurred in compliance with the summons"). We also adopt the general proposition that a non-party should not be expected to bear as great an expense as a party when complying with a subpoena, a principle which finds support in the fact that Rule 45 distinguishes between reimbursement for parties and non-

---

[14] The reduction of Kronos's estimate of compliance to $75,000 was likely the result of the new limitations added by the District Court on remand.

parties.  See Fed. R. Civ. P. 45(c)(2)(B)(ii) (providing that a district court "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance" with a subpoena).

With these rules in mind, we will remand for the District Court to reconsider how the costs of production should be allocated in this matter.

## VI.

For the foregoing reasons, we will reverse the judgment of the District Court.  We will remand for additional proceedings consistent with this opinion.